# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

CITY OF WILMINGTON, )
           )
               Appellant, )
           )
        v. ) C.A. No. 10329-VCG
           )
FRATERNAL ORDER OF POLICE )
LODGE 1, )
           )
               Appellee. )

## MEMORANDUM OPINION

Date Submitted: March 24, 2015
Date Decided: June 30, 2015

David H. Williams, of MORRIS JAMES LLP, Wilmington, Delaware; *Attorney for Appellant*.

Jeffrey M. Weiner, of the LAW OFFICE OF JEFFREY M. WEINER, P.A., Wilmington, Delaware; *Attorney for Appellee*.

**GLASSCOCK, Vice Chancellor**

Employers and employees typically agree on terms before work commences. This common-sense custom did not prevail in the current dispute, which involves a small bargaining unit of police captains and inspectors (the "Bargaining Unit") employed by the City of Wilmington (the "City"). Those individuals have been working since mid-2010 without a contract. Negotiations between the City and the Bargaining Unit's exclusive bargaining representative, the Fraternal Order of Police, Lodge 1 (the "FOP"), did not even begin until November of 2010 and were not fruitful. The employees have been paid under the terms of the former contract, which expired on June 30, 2010, as called for in the law governing collective bargaining between police and Delaware governmental entities—the Police Officers' and Firefighters' Employment Relations Act (the "POFERA"), 19 *Del. C.* § 1601 *et seq.* Eventually, pursuant to the terms of the POFERA, the parties came before an arbitrator, who, under POFERA rules, was required to choose, based on statutory criteria, between the last, best, final offer ("LBFO") of each party, which had to be accepted in toto. In making this choice, the arbitrator had discretion, except with respect to one factor: If the City could not pay the salary and benefits proposed in the FOP's LBFO from "existing revenues," the arbitrator was required to reject that proposal and impose the City's LBFO.

The arbitrator ruled on September 8, 2014, accepting the FOP's LBFO after finding that the City could "afford" it, apparently finding it could be paid for with

1

existing revenues. The FOP's offer was for a period ending on June 30, 2014. Thus, as of the time of the arbitration order, the term of employment called for had been completed in its entirety. Exercising its rights under the POFERA, the City appealed the arbitrator's decision to the Public Employment Relations Board (the "PERB"), which affirmed, and then appealed the decision of the PERB to this Court.

The parties agree that the POFERA was adopted by the General Assembly under the apparent (and entirely reasonable) assumption that it would apply prospectively, here meaning the parties would use the POFERA to resolve collective bargaining disputes over contracts governing future relationships. The differences between the parties arise in large part because of the difficulties of applying the POFERA where the parties have acted in reverse order—work first, then agree to terms. The issues raised are legal, and subject to *de novo* review. I find, for the reasons below, that the arbitrator and the PERB got some issues of law right and some wrong. Because those issues they got wrong might have affected the exercise of discretion by the arbitrator, I ask the parties to comment on whether a remand is necessary. The facts, and my reasoning, are set out below.

# I. BACKGROUND FACTS[1]

This case arises under the POFERA, which, generally, grants Delaware's police officers and firefighters certain rights to collectively bargain, sets forth the laws governing that process—including a process for resolving collective bargaining disputes—and charges the PERB with administering those laws.[2] Pursuant to the POFERA, collective bargaining disputes proceed first to mediation and, if mediation is unsuccessful, then to binding interest arbitration.[3] An arbitrator's decision may be appealed to the PERB, whose decision may then be appealed to this Court.[4] Before me is such an appeal by the City from a decision of the PERB, itself affirming on appeal an arbitrator's decision resolving a collective bargaining dispute between the FOP and the City in favor of the FOP.

*A. The Parties*

The City is a public employer within the meaning of Section 1602(l) of the POFERA.[5]

---

[1] Unless otherwise indicated, the factual background is drawn from the record created in the PERB proceedings. Citations to that record appear as "R. [page number]," without the use of short forms.

[2] *See* 19 *Del. C.* § 1601.

[3] *See id.* §§ 1614–1615. Interest arbitration is a process in which the terms and conditions of the parties' contract are established by an arbitral tribunal; it differs from so-called "grievance arbitration," in which an arbitral panel applies the terms and conditions of a contract already in existence between the parties to a dispute between those parties in order to determine whether the contract has been breached. Arvid Anderson & Loren A. Krause, *Interest Arbitration: The Alternative to the Strike*, 56 Fordham L. Rev. 153, 153 (1987).

[4] *See* 19 *Del. C.* §§ 1609, 1615.

[5] *See id.* § 1602(l).

3

The FOP is an employee organization within the meaning of Section 1602(g) of the POFERA,[6] and is certified by the PERB as the exclusive bargaining representative of the Bargaining Unit, a small group of high-ranking police officers employed by the City.[7] At the time of the arbitration hearing, the Bargaining Unit included seven captains and one inspector, and had one additional vacancy for an inspector.[8]

### B. The Parties' Collective Bargaining Dispute

The City and the FOP were parties to a collective bargaining agreement ("CBA") for the Bargaining Unit that had a term of July 1, 2007 through June 30, 2010, which comprises the City's fiscal year ("FY") 2008 through FY 2010.[9] Following the expiration of that CBA, the City and the FOP entered into prolonged and unsuccessful negotiations on a successor CBA from November 2010 to February 2012.[10] Unable to reach an accord, the parties attempted, again unsuccessfully, to mediate their dispute from June 2012 to January 2014 with a PERB-appointed mediator.[11] On January 20, 2014, the mediator recommended, at

---

[6] *See id.* § 1602(g).
[7] R. 1354; *see also* 19 *Del. C.* § 1602(h) (defining "exclusive bargaining representative").
[8] R. 600, 1224–25. In total, at the time of the hearing the City employed 306 police officers, including captains and inspectors, of its authorized strength of 320 officers. R. 1363. The FOP also represented the 298 rank-and-file officers employed by the City at the time. R. 1363.
[9] R. 1354. The City's fiscal year runs from July 1st of the previous calendar year (*i.e.*, FY X – 1) to June 30th of the following calendar year (*i.e.*, FY X).
[10] R. 1354, 1427.
[11] R. 1355.

the behest of the FOP, that the parties' dispute be submitted to arbitration.[12]  The

PERB determined that arbitration was appropriate and commenced arbitral

proceedings with Deborah L. Murray-Sheppard, the Executive Director of the

PERB, serving as arbitrator for the dispute (the "Arbitrator").[13]

Following the expiration of the parties' previous CBA and during the

pendency of the parties' dispute over a successor CBA, the members of the

Bargaining Unit remained employed with the City and, as is required by law,

continued to receive the pay and benefits to which they were entitled in the last

year that the previous CBA was in effect (*i.e.*, FY 2010).[14]

*C. The Parties' Last, Best, Final Offers*

Pursuant to the POFERA, arbitration on collective bargaining disputes

between a public employer and its police and firefighter unions is done "baseball

style."  Each side presents to the arbitrator its LFBO, and the arbitrator is then

required, based on an evaluation of seven factors set out in 19 *Del. C.* § 1615(d),[15]

---

[12] R. 1355.

[13] R. 1355.

[14] Oral Arg. 36:15 – 23.  By the time the dispute reached arbitration, though, the City had reduced the number of captains from its previous number of eight to seven through attrition, resulting in the work of the outgoing captain being redistributed among the remaining seven Captains.  R. 1363.

[15] Those factors are:

    (1) The interests and welfare of the public.

    (2) Comparison of the wages, salaries, benefits, hours and conditions of employment of the employees involved in the binding interest arbitration proceedings with the wages, salaries, benefits hours and conditions of employment of other employees performing the same or similar services or requiring similar skills under similar working conditions in the same

to chose the LBFO of *either* the public employer *or* the union; the arbitrator may not pick and choose between provisions of the two LBFOs, or create terms of her own.[16]

In February 2014, the FOP and the City each submitted its LBFO for consideration by the Arbitrator.[17] In the FOP's LBFO, the FOP proposed a CBA with a term of July 1, 2010 through June 30, 2014—*i.e.*, covering the fiscal years that had passed since the parties' previous CBA had expired.[18] Among other things, the FOP's LBFO included retroactive cost-of-living adjustments to the salary schedules for FY 2012 and FY 2013, effectuating retroactive increases in

---

community and in comparable communities and with other employees generally in the same community and in comparable communities.
(3) The overall compensation presently received by the employees inclusive of direct wages, salary, vacations, holidays, excused leaves, insurance and pensions, medical and hospitalization benefits, the continuity and stability of employment, and all other benefits received.
(4) Stipulations of the parties.
(5) The lawful authority of the public employer.
(6) The financial ability of the public employer, based on existing revenues, to meet the costs of any proposed settlements; provided that any enhancement to such financial ability derived from savings experienced by such public employer as a result of a strike shall not be considered by the binding interest arbitrator.
(7) Such other factors not confined to the foregoing which are normally or traditionally taken into consideration in the determination of wages, hours and conditions of employment through voluntary collective bargaining, mediation, binding interest arbitration or otherwise between parties, in the public service or in private employment.

19 *Del. C.* § 1615(d).
[16] *See id.* ("The binding interest arbitrator shall make written findings of facts and a decision for the resolution of the dispute; provided however, that the decision shall be limited to a determination of which of the parties' last, best, final offers shall be accepted in its entirety.").
[17] R. 1355.
[18] R. 38.

annual salary of $1,000 to $3,000 (depending on the specific Bargaining Unit employee) for each of those years.[19] The cost of these salary increases, as well as of other costs generated by the FOP's LBFO, would be partially offset by crediting the City for a one-time payment it made to all City employees in lieu of a cost-of-living adjustment in November 2012 and by increasing the Bargaining Unit employees' contributions to healthcare costs, effective retroactively on January 1, 2013.[20] The FOP estimated that the total projected cost of its LBFO through FY 2014 would be $45,653.56.[21] The City, on the other hand, estimated the projected cost through FY 2015, arguing that the costs of the increased salaries would carry over automatically when the CBA expired in FY 2014; it placed this projected cost at $184,685.[22]

As to the City's LBFO, the City proposed a CBA with a term from July 1, 2014 through June 30, 2016—*i.e.*, covering, at the time, future fiscal years. Among other things, the City's LBFO increased the Bargaining Unit employees' contributions to healthcare costs.[23] However, the City's LBFO did not include any cost-of-living adjustments, to either the fiscal years covered by the proposed CBA or the fiscal years prior.[24] As a result, the City's LBFO would not cause the City to

---

[19] *See* R. 38–42.
[20] R. 38–39, 43–44; *see also* R. 1368–69.
[21] R. 1369; *see also* R. 1304.
[22] R. 1316.
[23] R. 46, 49.
[24] R. 46–47, 1374–75.

incur any additional costs, and in fact would decrease total compensation to the Bargaining Unit employees by increasing their healthcare costs.[25]

### D. The City's Finances

Among the seven Section 1615(d) factors which the arbitrator must consider in making her determination as to which LBFO to adopt is subsection (d)(6), "the financial ability of the public employer, based on existing revenues, to meet the costs of any proposed settlement."[26] While the arbitrator is statutorily bound to consider all factors listed in Section 1615(d), the factor in subsection (d)(6), and only this factor, may be dispositive on the arbitrator's analysis.[27] In other words, subsection (d)(6) serves as a disqualifier: The arbitrator *must* accept the public employer's LBFO if it determines that the public employer does not have the financial ability, based on existing revenues, to meet the costs of the union's LBFO, provided, of course, that the public employer has the financial ability to meet the costs of its own LBFO.[28]

---

[25] R. 1368.

[26] 19 *Del. C.* § 1615(d)(6).

[27] *See id.* § 1615(d) ("In making determinations, the binding interest arbitrator shall give due weight to each relevant factor. . . . With the exception of paragraph (d)(6) of this section, no single factor in this subsection shall be dispositive."); *Fraternal Order of Police, Lodge 5 v. New Castle Cnty.*, 2014 WL 351009, at *5 (Del. Ch. Jan. 29, 2014).

[28] I note that this disqualifier technically works both ways—the arbitrator must accept the union's LBFO if she determines that the public employer has the ability, based on existing revenues, to meet the costs of the union's LBFO but not to meet the costs of its own LBFO— although this scenario, obviously, is unlikely.

In the arbitration, on appeal to the PERB, and now on appeal to this Court, the City has argued that it does not have the financial ability, based on existing revenues, to meet the costs of the FOP's LBFO. Thus, in all three proceedings, the City's finances have been a central focus.

### 1. The City's Budget

#### a. The Budget Process

The City's charter (the "Charter") requires the City each fiscal year to pass and maintain a balanced budget, which, according to the Charter, means a budget where projected revenues equal operating expenditures plus any existing deficits.[29] Each budget cycle, the Office of the Mayor of the City (the "Mayor"), working in conjunction with the Office of Management and Budget (the "OMB") and the Department of Finance, and in consultation with the heads of the City's various other departments and the public, must determine the City's existing deficit and surplus, create revenue projections for the City for the upcoming year, develop an initial budget proposal, and submit all of this information to the City's legislative

---

[29] *See* Wilm. C. (Charter) § 2-300(1) ("It shall be the duty of the council, at least thirty (30) days before the end of the fiscal year, to adopt the annual operating budget ordinance for the next fiscal year."); *id.* § 2-300(2) ("The annual operating budget ordinance shall provide for discharging any deficit and shall make appropriations to the council, the mayor, and all officers, departments, boards and commissions which form a part of the executive or administrative branch of the government, and for all other items which are to be met out of the revenue of the city."); *id.* § 2-302 ("Not later than the passage of the annual operating budget ordinance, the council shall ordain such revenue measures as will, in the opinion of the mayor, yield sufficient revenue to balance the budget.").

body, the City Council (the "Council").[30]  The Charter reserves the authority to alter and adopt the budget on behalf of the City to the Council.[31]  However, in finalizing the budget provided to it by the Mayor, the Council must utilize the Mayor's estimates for the City's surplus, deficit, and projected revenues.[32]

Once the Council has adopted the budget, it may not make any additional operating appropriations in that fiscal year except in certain situations enumerated in the Charter, such as to meet the costs of unanticipated emergencies.[33]  In cases where the Council does modify the budget to appropriate additional money, the Council "must determine and approve the revenue by which [the] addition to the budget will be funded" in order to maintain a balanced budget;[34] any portion of the additional costs that cannot be paid out of the revenues for that fiscal year carry over to the following fiscal year as deficit.[35]

---

[30] *Id.* § 4-401(b); R. 640–41.
[31] Wilm. C. (Charter) § 2-300(1); *see also* R. 641.  The Council's approved budget, however, is subject to the Mayor's traditional and line-item veto, both of which may be overridden by a two-thirds vote of the Council.  *See* Wilm C. § 2-202.
[32] Wilm. C. (Charter) § 2-300(3); *see also* R. 641.
[33] *See* Wilm. C. (Charter) § 2-301; R. 641.  For example, in FY 2014 the Council had to approve additional spending so the City could cover the unanticipated expenses of severe winter weather. R. 929.  The OMB "has the authority to transfer budget allocations between accounts that are within the same Fund, Department, and Account Group," but the Council must approve "[a]ny other type of transfer, such as between Funds, Departments or different Account Groups" as well as any deletions to the budget.  R. 641.
[34] R. 641.
[35] Wilm. C. (Charter) § 2-301.

The City can only spend money that has first been appropriated through the budget process, either as part of the budget's initial approval or as part of an *ex post* modification.[36]

### b. Deficit Spending

Despite the balanced budget requirement in the Charter, it is still possible for the City to engage in deficit spending, meaning in any given fiscal year the City's expenditures exceed revenues generated by the City. This could occur inadvertently in the budget process, such as if the Mayor overestimates the City's revenues in its projections, allowing the Council to appropriate more money than the City can actually match with revenues, but it could also occur advertently at certain stages in the budget process. First, in the development phase, it is the City's financial policy that the Mayor may, with limited exceptions, include prior years' accumulated surplus in its revenue projections.[37] This allows the City to "limit[] tax increases because prior years' surplus [is] used prior to revenue enhancements."[38] Second, if the Council modifies the budget during the fiscal year to make additional appropriations, the Council may ordain prior years'

---

[36] *See* Wilm. C. (Charter) §§ 2-300, 2-301; R. 929.

[37] *E.g.*, R. 646; *cf.* R. 641 ("For the budget to be legally balanced, revenues plus an amount of existing prior years' surpluses, if any, must equal operating expenditures plus any existing deficits."). The exceptions are those portions of prior years' accumulated surplus "designated for debt service, encumbrances or the Budget Reserve Account." R. 646; *see also infra* note 46 (explaining the Budget Reserve Account).

[38] R. 646.

accumulated surplus as the "revenue" by which to fund those additional expenditures.[39]

### c. Fund Accounting

In order to "segregate the specific purposes and operations of the various activities of the City," the City organizes its budget, including both the accounting and budgeting portions, into four major funds: The General Fund, the Special Funds, the Water/Sewer Fund, and the Internal Service Fund.[40] According to the City, "Funds can be thought of as being like the subsidiaries of a major conglomerate corporation. Each subsidiary is responsible for its own operational results and strategy, yet is still part of the larger conglomerate corporation when it comes to overall management and financial results."[41] Basic municipal operations and services, including police and fire protection, fall under the General Fund, the revenues for which are derived from taxes, fees, fines, and interest on investments.[42] The parties here agree that the revenue available to meet the costs of their CBA must come from the General Fund.

For each budget cycle, the City's budget includes balance sheets in its financial statements that tally the General Fund's "fund balance" as of the end of

---

[39] *See, e.g.*, R. 929–30.
[40] R. 642. With the exception of certain smaller funds within the Special Funds, the expenditures for all the four major funds are appropriated through the budget process. R. 651.
[41] R. 642.
[42] R. 649.

the prior fiscal year.[43]  This value accounts for the difference between the General Fund's assets and liabilities at that moment in time.[44]  In other words, the General Fund's fund balance in the financial statements represents the net calculation for the General Fund's annual operating surpluses and deficits in all previous years:  If the fund balance is positive, the City has accumulated a net surplus in the General Fund; if it is negative, the City has accumulated a net deficit in the General Fund. It is important to note that, if the City has accumulated a surplus in the General Fund, the fund balance is not an actual repository where the assets constituting that accumulated surplus can be found, but rather it is simply an accounting of those assets across the General Fund, in whatever form or location they may actually exist.[45]

The budget's balance sheets further break down the General Fund's fund balance into the following subcategories:

> *Non-spendable* – Amounts that cannot be spent either because they are in a non-spendable form or because they are legally or contractually required to be maintained intact.

---

[43] *See, e.g.*, R. 675.

[44] *E.g.*, R. 675.  The City labels the difference between fund assets and liabilities as "fund balance" on its financial statements for all funds designated as "government funds," including the General Fund and the Special Funds.  R. 675; *see also* R. 649.  For funds designated as "proprietary funds" or "fiduciary funds," such as the Water/Sewer Fund, the City labels the difference between fund assets and liabilities as "net assets" on its financial statements.  R. 676. Information regarding fund balance or net assets pertains only to the specific fund in which it is reported, not the City's finances as a whole.

[45] *See, e.g.*, R. 928, 965–67.  For example, the General Fund's fund balance may account both for cash assets that the City has invested in a specific CD as well as certain of the City's receivables that exist only as claims for payments.

*Restricted* – Amounts that can be spent only for specific purposes because of the City Charter, City Code, State or federal laws, or externally imposed conditions by grantors or creditors.

*Committed* – Amounts that can be used only for specific purposed [sic] determined by a formal action by City Council ordinance or resolution. This includes the Budget Reserve Account.[46]

*Assigned* – Amounts that are allocated for a future use by the Mayor, but are not spendable until a budget ordinance appropriating the amounts is passed by City Council.

*Unassigned* – All amounts not included in other spendable classifications.[47]

Like the fund balance, each of these subcategories represents a mathematical calculation—each tracks a specific portion of the net assets in the General Fund based on the nature of the restrictions placed on the City's ability to utilize the assets.[48] Thus, also like the fund balance, none of the subcategories represent an actual repository where the certain "type" of asset in that subcategory can be

---

[46] The City is required to maintain a "Budget Reserve Account" within the General Fund equal to 10% of the upcoming year's General Fund budget. Wilm C. §§ 2-376, 2-377; *see also* R. 955. The money in the Budget Reserve Account may only be used for "adverse economic conditions or public emergency and when declared by council by ordinance enacted by a two-thirds vote (nine) of the city council, following certification by the mayor of such economic conditions or public emergency," and the money must be replenished from year to year. Wilm. C. §§ 2-376, 2-377; *see also* R. 955–56. However, in 2009, the City passed an ordinance allowing the City treasurer to use the money in the Budget Reserve Account to pay the City's employee payroll, debt service, and accounts payable in FY 2009, and requiring the treasurer to fully replenish the money in the Budget Reserve Account by the following October; the City renewed that ordinance for FY 2010, FY 2012, FY 2013, and FY 2014. *See* Wilm. C. § 2-379. On May 15, 2015, the City again renewed the ordinance for FY 2015. *See* Wilm. Ordinance 15-017, § 1 (May 15, 2015).

[47] R. 675.

[48] *See* R. 927–28.

14

found, but instead each is an accounting of all the net assets of that "type" that exist in whatever form across the General Fund.

### d. The Unassigned Fund Balance

The General Fund's unassigned fund balance (the "Unassigned Fund Balance") accounts for those net assets within the General Fund that are not subject to any of the limitations found in the other subcategories. Typically, the General Fund's "unassigned" net assets include—but are not all—cash and cash equivalents, such as checking accounts, savings accounts, and CDs.[49] In the arbitration proceedings, the Director of the OMB, Robert Greco, explained the Unassigned Fund Balance in these general terms:

> [I]n other words, just like a business or even for yourself as a person you have what is called net worth. And what [the City does] at the end of the fiscal year[,] the City looks and says, Here [are] our assets, subtract out [our] liabilities, and then also subtract out any reserve accounts like the budget reserve or reserve for encumbrances.
>    The value left, that dollar amount, is called unassigned fund balance. It's not all cash and it's not a fund sitting there called unassigned fund balance, it just has cash. It is, again, a mathematical calculation that changes month-to-month, year-to-year.[50]

Greco testified that the Unassigned Fund Balance generally ebbs and flows with the General Fund's net operating deficits and surpluses. If there is a net operating surplus in the General Fund in any given fiscal year, the incoming assets

---

[49] R. 967–69. For the sake of simplicity, for the remainder of this Memorandum Opinion I will refer to cash and cash equivalents together using the shorthand "cash assets."
[50] R. 928–29; *see also* R. 966–69.

from that surplus are likely to be spendable, unrestricted, uncommitted, and unassigned, and thus their value will "flow," conceptually, to the Unassigned Fund Balance, causing it to grow from the previous year.[51] Conversely, if there is a net operating deficit within the General Fund in any given fiscal year, and the City has appropriated prior years' accumulated surplus to finance the deficit expenditures, the outgoing surplus assets may be assets that were previously categorized as "unassigned," causing the Unassigned Fund Balance to shrink.[52] Greco explained that this scenario is especially likely to play out in situations where the Council is modifying the budget during the fiscal year to add appropriations for expenditures that require quick payment; Greco explained that in this scenario, if the City lacks the actual revenues, the Council is likely to finance the expenditures using unassigned net assets from the General Fund, specifically, cash assets:

> Where [the City] find[s] that money[,] in this case the money went out the door, so, it was actually working capital, cash that is on hand that the treasurer's office uses, he has money invested in CD's and other things, a checking account. So, at the end of the year all else being equal if [the City] overspend[s] . . . [it] ha[s] revenues and [it] ha[s] more expenses than revenues, that unassigned fund balance is going to go down; but, again, it's a calculation, it's not a true fund that sits there just with cash. The treasurer's office actually has to go to an asset account, cash account or CD, liquidate that to pay for these kind[s] of things.[53]

---

[51] *See* R. 929 ("Now, if you do have more revenues than expenditures, those will flow into that calculation and, obviously, if it doesn't get put anywhere else or [the City's] liabilities don't increase or expenses [increase], it will increase [the City's] unassigned fund balance.").

[52] *See, e.g.*, R. 929–30; 965–66.

[53] R. 929–30; *see also* R. 968 ("And, again, I can't state this more clearly than this. The [M]ayor is asking [the Council] to deficit spend, he is not allowed to do that on his own. He is asking [the

According to Greco, if the City was forced to accept the FOP's LBFO, this is also the most likely scenario as to how the City would meet the costs of that proposal.[54]

## 2. The City's Financial Condition

The parties have stipulated that the City's budgets over the four years covered by the FOP's LBFO generated the following net operating surpluses and deficits in the General Fund: a net operating surplus of $6,055,527 in FY 2011; a net operating surplus of $7,444,088 in FY 2012; a net operating surplus of $1,326,984 in FY 2013; and a net operating deficit of $1,170,833 in FY 2014.[55] Additionally, the parties have stipulated that the City is projected to generate a net operating surplus of $1,400,905 in the General Fund for FY 2015, and a net operating deficit of $333,508 in the General Fund for FY 2016.[56]

The Unassigned Fund Balance existing at the end of FY 2012 was $21,964,373.[57] In the City's budget for FY 2014, the City estimated that the Unassigned Fund Balance had grown to $25,917,354 by the end of FY 2013, and

---

Council] to deficit spend and what [it is] doing is [it is] using assets on hand. Somewhere, somehow some assets have to be liquidated, a CD, money has to be taken out of a checking account. . . . [T]here is not this unassigned fund balance sitting alone and has cash in it. It always comes from the assets. Again, this calculation gives you a value of your unassigned fund balance. It is not in and of itself an actual savings account.").

[54] *See* R. 946 ("That money [for the FOP's proposal] would come out of either reserves, unassigned fund balance, cash. We would then have to go back to [the Council]. [It] would make an appropriation. So you would actually see an increase in the fiscal year whenever it was paid. If it was paid this year, we would have to increase the budget in 14 and then [the City treasurer] would have to cash out a CD and pay out those increases.").

[55] Stipulation (Mar. 16, 2015).

[56] *Id.*

[57] R. 675; *see also* R. 999–1000.

projected that the Unassigned Fund Balance would grow to approximately $28,520,703 by the end of FY 2014.[58] As of April 2014, cash assets accounted for $5,699,343 of the Unassigned Fund Balance.[59]

## E. The Arbitration Decision

The Arbitrator held a two-day hearing on May 6–7, 2015, after which, on or about September 8, 2014, she issued her decision[60] that "the last, best, final offer of FOP Lodge 1 is . . . the more reasonable [proposal] based upon the statutory criteria set forth in 19 *Del C.* § 1615."[61] In reaching that decision, the Arbitrator first determined that "[t]he record does not support the conclusion that the City has an *inability to afford* the limited costs of the FOP offer."[62] The parties agree that, by this language, the Arbitrator was attempting to address subsection (d)(6) and its requirement that the LBFO selected must be payable from "existing revenues;" they disagree, however, as to whether she properly analyzed that factor. Although the Arbitrator's decision covers each of the Section 1615(d) factors, only its

---

[58] R. 675; *see also* R. 1000–01. Greco explained that the estimated growth in the unassigned fund balance in FY 2013 and the projected growth in the unassigned fund balance in FY 2014 was partially due to certain "non-spendable" net assets in the General Fund being reclassified as "unassigned." *See* R. 1000–01.

[59] R. 177; *see also* R. 1003–04.

[60] In conducting my review of the PERB's decision, I find it necessary to also review the Arbitrator's decision. In doing so, I find I agree with the Arbitrator on some issues and depart on others. Notwithstanding the latter, her decision overall is thoughtful, tightly reasoned, and well-written, a truth to which the brief excerpts of that decision cited herein do scant justice.

[61] R. 1386.

[62] R. 1386 (emphasis added).

analysis as to this latter issue under subsection (d)(6) is relevant to this Memorandum Opinion.

In the arbitration, the City argued that it "does not have the financial ability, based on existing revenues, to meet the costs of the FOP's LBFO."[63] As support, the City argued that, at the time of the hearing, it was projecting a structural deficit through FY 2018 due to "spiraling costs," such as funding pension plans.[64] In addition, the City argued that the potential sources of funds identified by the FOP to finance its LBFO, including the Unassigned Fund Balance, do not qualify as "existing revenues" as required by subsection (d)(6).[65] Specifically, the City argued that the Unassigned Fund Balance is a reserve,[66] which, according to the PERB's and this Court's precedent, does not constitute revenue.[67]

The Arbitrator rejected both of the City's positions. First, she determined that "[t]he evidence does not establish the 'structural deficit' asserted by the City."[68] Rather, she found that the City's projected deficits due in large part to funding pension plans are "commonly understood to be cyclical, rather than structural, deficits because they occur as a result of downturns in the economy," as

---

[63] R. 1311.
[64] *See* R. 1311–12.
[65] *See* R. 1313–15.
[66] R. 1314–15.
[67] *See, e.g.*, *FOP Lodge 5 v. New Castle Cnty.*, 2014 WL 351009, at *5 (Del. Ch. Jan. 29, 2014).
[68] R. 1364.

19

opposed to "large and persistent imbalances in expenditures to revenues."[69]  In actuality, the Arbitrator found, the City had "been effective in addressing the projected revenue declines and expense increases in a proactive manner, by increasing property taxes, implementing budget cuts, and restructuring debt service, as evidenced by the surpluses in FY 2011–2013, and a projected surplus for FY 2015."[70]

Next, the Arbitrator determined that the Unassigned Fund Balance does not constitute a reserve.[71]  In reaching that conclusion, she relied on a 2002 POFERA arbitration decision, *City of Seaford v. Fraternal Order of Police, Lodge 9*,[72] wherein the arbitrator defined "reserves" as those assets whose utilization is within the exclusive authority of the Council and which are assigned to reserve status by an affirmative act of the Council.[73]  After briefly examining the nature of the Unassigned Fund Balance, the Arbitrator concluded that it "does not constitute a reserve because assets are not 'allocated' to this fund by an affirmative act of the Council, nor are there restrictions upon its use."[74]  Further, she noted that the "Council has allocated moneys from [the] [U]nassigned [F]und [B]alance to

---

[69] R. 1365.
[70] R. 1365.
[71] R. 1368.
[72] IV PERB 2659 (July 15, 2002) (Decision of the Interest Arbitrator on Remand).  The *City of Seaford* was adopted by this Court in *Fraternal Order of Police, Lodge 5 v. New Castle Cnty.*, 2014 WL 351009 (Del. Ch. Jan. 29, 2014).
[73] *See* R. 1368 (quoting *City of Seaford*, IV PERB at 2675).
[74] R. 1368.

20

adjusted projected budgets to conform to actual revenues and expenditures in the same manner that all funds are allocated each fiscal year."[75]

Finally, the Arbitrator evaluated the projections offered by both parties for the total cost of the FOP's LBFO, finding that "[t]he City's estimate of $127,648 for FY 2011 through FY 2014 (backing out the estimated cost for FY 2015 of $57,010) . . . [is] closer to accurate."[76] She rejected as "purely speculative" the City's argument that the Bargaining Unit members' increased salaries under the FOP's proposal would irreversibly carry over into FY 2015 and perhaps beyond, reasoning that the POFERA collective bargaining process could lead to retroactive reductions in the Bargaining Unit members' salaries for the fiscal years following the effective term of the FOP's proposal:

> Should the FOP prevail in this matter, the parties would be required to enter into negotiations for a successor agreement to be effective on July 1, 2014. If the City is able to establish that its fiscal situation has deteriorated, the next agreement could include cost savings and/or a change in either the structure or amounts of [salary] step increases for this bargaining unit.[77]

---

[75] R. 1368.

[76] R. 1369.

[77] R. 1370. The arbitrator also chastised the parties for allowing so much time to pass without a CBA in place and encouraged them to immediately begin negotiations on a successor agreement to begin in FY 2015. *See* R. 1386 ("The extended period of time which has elapsed since the expiration of the last agreement is not reasonable and is contrary to the purposes of the POFERA and the interests and welfare of the public in the efficient and effective operation of the government. This decision will require the parties to initiate successor negotiations immediately. They are encouraged to enter into those negotiations with full and complete awareness of the City's financial projections as well as the recent and continuing fiscal concerns. The parties are further encouraged to actively engage in these negotiations quickly and expeditiously rather than allowing them to drag on to the detriment of their relationship and their capacity to move

As proof that "[t]he City's presumption that all [salary] step increases are immutable into the future is overly simplistic and not persuasive," the Arbitrator alluded to a 2012 POFERA arbitration decision wherein the arbitrator reduced salaries for certain New Castle County police officers.[78] Lastly, the Arbitrator noted that City had failed to dispute the FOP's argument that the City would realize salary savings of approximately $107,606 in FY 2014 due to the City appropriating money to cover the salaries for two vacant positions—the Chief of Police and one Inspector.[79]

After reaching these findings of law and fact, the Arbitrator ruled that "[f]or all these reasons, I conclude that the City has not established that it has either a structural deficit or an inability to afford the costs of the FOP's last, best, final offer."[80]

*F. The PERB Decision*

On September 15, 2014, the City filed its Request for Review of the Arbitrator's Decision with the PERB, arguing that the Arbitrator committed three legal errors in her decision: (1) the Arbitrator failed to apply the statutory standard to evaluate the City's inability to meet the costs of the FOP's LBFO by assessing

---

forward to proactively and cooperatively address the public safety challenges facing the City and its residents.").
[78] R. 1370–71.
[79] R. 1371.
[80] R. 1371.

the City's "ability to afford" the FOP's LBFO rather than the City's financial ability to meet the costs based on existing revenues; (2) the Arbitrator improperly found that the Unassigned Fund Balance constitutes "existing revenue;" and (3) the Arbitrator erred by not considering the continuing nature of the salary increases in the FOP's LBFO beyond FY 2014.[81] The PERB convened a public hearing on October 9, 2014, at which time the PERB met in public session to consider the merits of the City's appeal and to hear oral arguments by the parties.[82]

On October 23, 2014, the PERB issued a written decision unanimously affirming the arbitration decision.[83] First, the PERB found that the Arbitrator had properly focused on whether there were existing revenues to meet the costs of the FOP's proposal, as evidenced by her analysis as to whether the Unassigned Fund Balance was a reserve under *City of Seaford*.[84] Second, the PERB found that the Arbitrator had correctly applied *City of Seaford* to find that the Unassigned Fund Balance is not a reserve, and thus "is not excluded as 'existing revenues.'"[85] The PERB also rejected a new argument the City raised on appeal[86] that, even if the Unassigned Fund Balance is not a reserve, it still does not constitute "existing

---

[81] *See* R. 1388–89.
[82] R. 1428.
[83] R. 1429.
[84] *See* R. 1429–30.
[85] *See* 1429–31.
[86] *Compare* R. 1319–20 (arguing, in post-hearing briefing in the arbitration, only that the Unassigned Fund Balance is a reserve), *and* R. 1349 (same), *with* R. 1389 (arguing, in the appeal to the PERB, that "even if the Arbitrator is correct in concluding that the [U]nassiged [F]und [B]alance does not constitute a reserve, the fact remains that it does not constitute revenue").

23

revenues" because it is not a stream of revenue "flowing into the City's coffers," finding that "[t]he City conflate[d] 'current revenues' with 'existing revenues'":

> [The City] asserts the decision in *Seaford* requires a current stream of revenue to meet the additional costs of the last, best, final offer. The statute, however, focuses on the public employer's 'existing revenues.' We construe that to mean that the analysis must focus on the City's financial landscape based on the sources of revenue it had at the time the analysis is undertaken without regard to its ability to raise additional revenue through taxation or other means. Nothing in the statute requires that the consideration of revenues be limited to the current fiscal year or to any other specific, limited period of time. The logical extension of the City's argument would result in the preclusion of any wage increase unless the City offered it.[87]

Finally, the PERB rejected the City's argument that the projected total cost of the FOP's LBFO should include salary increases in FY 2015, reasoning, like the Arbitrator, that the City "is not prohibited (and is in fact encouraged) to engage in negotiations which may modify wages and/or allow for savings in other areas which are necessary to fund or to continue to fund negotiated wage rates."[88]

### G. Procedural History

On November 7, 2014, the City appealed the PERB decision to this Court. The grounds for appeal stated in the City's Notice of Appeal were that: (1) the PERB erred as a matter of law; (2) the PERB erred as a matter of fact; (3) the PERB acted in an arbitrary and capricious manner; and (4) the PERB's decisions

---

[87] R.1430.
[88] R. 1431.

24

are not supported by substantial evidence. The issues that the City has presented to me, however, are purely legal.

On November 14, 2014, the City notified the PERB of its compliance with the PERB decision, including that the City had distributed retroactive salary payments to the Bargaining Unit members in accordance with the FOP's LBFO.[89]

I heard oral argument on the City's appeal on March 11, 2015.[90] Following argument, I issued a brief letter to the parties informing them that I was still unclear as to how the term "existing revenues" in 19 *Del. C.* § 1615(d)(6) was supposed to apply in the context of arbitrating retrospective CBAs, and offering them the opportunity to submit supplemental briefing on this narrow issue of statutory interpretation. Those additional memoranda were fully submitted by March 25, 2015.

*H. The Parties' Contentions*

The City challenges three aspects of the Arbitrator's, and thus also the PERB's, decision:

> First, the decisions disregard the statutory standard ("The financial ability of the public employer, based on existing revenues, to meet the costs of any proposed settlement"), and substitute the standard of "inability to afford the costs of the FOP's last, best, final offer." Second, the decisions incorrectly determine [that] the cash assets in

---

[89] *See* R. 1433–34.
[90] At the conclusion of oral argument, I asked the parties to submit a stipulation as to the City's General Fund net operating surpluses or deficits for FY 2011 to FY 2014 and projected net operating surpluses or deficits for FY 2015 and FY 2016. The parties submitted that stipulation on March 16, 2015.

the Unassigned Fund Balance are existing revenues. Third, the decisions refuse to acknowledge that the salary increases in the FOP's proposal are recurring, and will persist in [FY 2015], and in all likelihood beyond [FY 2015].[91]

Should this Court rule in its favor, the City contends that the record is sufficient to demonstrate that it is unable to meet the costs of the FOP's LBFO, and, since this factor is dispositive under Section 1615(d), that the Court must reverse the Arbitrator's and the PERB's decisions and implement the City's LBFO in its entirety. The FOP responds that both the Arbitrator and the PERB correctly applied the provisions of the POFERA, and that the Court should affirm their respective decisions.

### 1. "Ability to Afford" Standard versus the Statutory Standard

The City argues that, in looking to whether the City could meet the costs of the FOP's LBFO, both the Arbitrator and the PERB mischaracterized assets in the Unassigned Fund Balance as existing revenues, causing them both to decide the issue according to a standard of whether the City could "afford" the costs based on cash on hand, rather than the statutory standard required by Section 1615(d)(6).[92]

The FOP counters that both the Arbitrator's and the PERB's analysis on the City's financial ability to meet the costs of the FOP's LBFO was based on existing

---

[91] *See* City of Wilmington's Opening Br. in Supp. of Its Appeal at 10–11 (citations omitted).
[92] *See, e.g., id.* at 11–13.

revenues.[93]  Essentially, the FOP argues that any reference to the City's ability to "afford" the proposal was merely shorthand for the statutory standard.

As the parties' arguments indicate, the resolution of this issue is, at least potentially, dependent upon resolution of whether the assets accounted for in the Unassigned Fund Balance are statutory "existing revenues."  In other words, if I find that the Arbitrator and the PERB gauged the City's financial ability to meet the costs of the FOP's proposal based on the Unassigned Fund Balance, the question of whether that was an improper standard will depend on whether the term "existing revenues" applies to the Unassigned Fund Balance.  If I find that the Arbitrator and the PERB did *not* apply the proper statutory standard, I must still consider whether those legal errors were material to the outcome of the decisions.

### 2. The Unassigned Fund Balance as "Existing Revenues"

The City renews both its arguments from the PERB proceedings regarding the categorization of the Unassigned Fund Balance, arguing that the Unassigned Fund Balance is a reserve—and thus categorically prohibited from being considered as existing revenues—and that, even if it is not a reserve, the Unassigned Fund Balance does not include existing revenues.[94]  As to its first argument, the City contends that the Unassigned Fund Balance meets the *City of*

---

[93] Answering Br. of Appellee-Below Appellee Fraternal Order of Police Lodge 1 at 25–30.  *But see* notes 102–108 and accompanying text.

[94] *See* City of Wilmington's Opening Br. in Supp. of Its Appeal at 14–18.

*Seaford* criteria for a reserve, in that annual operating surpluses are, "by operation of law, set aside" into the Unassigned Fund Balance and that use of those assets requires the approval of Council.[95] As to its second argument, the City contends that the Unassigned Fund Balance does not meet the *City of Seaford* criteria for existing revenues, in that prior years' accumulated surplus is not "dynamic in character," does not "constitute[] a flow of moneys" into the City's coffers, and is not an "existing, stable and continuing source[] of revenue."[96] Rather, according to the City, these qualifiers illustrate that "existing revenues" must be interpreted to mean projected or actual revenues sufficient to meet the costs of the proposal in the year or years that those costs are to be incurred by the City if the proposal is adopted.[97] Here, because "the City was ordered to pay salary increases in a fiscal year ([FY 2014]) when there was a deficit, . . . [there are] no existing revenues to pay the salary increases."[98]

Additionally, in its supplemental briefing, the City raises for the first time the argument that "applying the ability to pay based upon existing revenues criteria retroactively is unworkable."[99] The City argues that the term "existing revenues" inherently means projected revenues at the time of the arbitration and is

---

[95] *Id.* at 14–15.

[96] *Id.* at 15 (quoting *Fraternal Order of Police, Lodge 5 v. New Castle Cnty.*, 2014 WL351009 at *6 (Del. Ch. Jan. 29, 2014) (quoting *City of Seaford v. Fraternal Order of Police, Lodge 9*, IV PERB 2659, 2675–76 (July 15, 2002) (Decision of the Interest Arbitrator on Remand))).

[97] *See* City of Wilmington's Supplemental Mem. of Law in Supp. of Its Appeal at 2–6.

[98] *Id.* at 5.

[99] *Id.* at 1.

28

meaningless in the context of negotiating retroactive agreements, as evidenced by both the fact that the POFERA's dispute resolution system is designed to forge a successor agreement *before* the parties' current contract expires and by the forward-looking language used in the *City of Seaford* criteria for existing revenues.[100] In support of both this argument and its previous argument that the Unassigned Fund Balance does constitute existing revenues, the City further makes a public policy plea that, were this Court to find that prior years' accumulated surplus is existing revenues that may finance retroactive salary increases for the Bargaining Unit employees, the City's surplus would be fair game for salary increases for all the City's unions, effectively precluding the City from maintaining an unrestricted and unassigned surplus.[101]

In its initial briefing, the FOP argued that the Arbitrator and PERB correctly determined based on *City of Seaford* that the cash assets included in the Unassigned Fund Balance are existing revenues.[102] First, the FOP contended that the Unassigned Fund Balance cannot be a reserve because assets are not "allocated" to the Unassigned Fund Balance by an affirmative act of the Council, nor are there restrictions on the use of the assets included in the Unassigned Fund

---

[100] *See id.* at 6–9.

[101] *See* City of Wilmington's Opening Br. in Supp. of Its Appeal at 17–18; City of Wilmington's Supplemental Mem. of Law in Supp. of Its Appeal at 9.

[102] *See* Answering Br. of Appellee-Below Appellee Fraternal Order of Police, Lodge 1 at 30–37.

Balance beyond the requirements applicable to appropriating any funds.[103] Second, the FOP argued that the cash assets accounted for by the Unassigned Fund Balance are "existing revenues," because, even though the Unassigned Fund Balance itself is not a "stream of revenue," there is no question that the cash assets included in its value derive from streams of revenue in previous years.[104] Finally, the FOP dismissed the City's public policy concern, arguing that it ignores the fact that the City is not bound by the POFERA or the Public Employment Relations Act (the "PERA")[105] to grant comity or parity among CBAs for different bargaining units.[106]

I note, however, that in its supplemental briefing as to the interpretation of Section 1615(d)(6) in the context of arbitrating retroactive CBAs, the FOP's position on this issue has somewhat shifted and no longer corresponds with the decisions of the Arbitrator and the PERB. In that brief, the FOP avers that the General Assembly intended the phrase "based on existing revenues" to mean that an arbitration decision "cannot mandate an increase or imposition of new taxes,

---

[103] Answering Br. of Appellee-Below Appellee Fraternal Order of Police, Lodge 1 at 32.
[104] *Id.* at 33.
[105] *See* 19 *Del. C.* §§ 1301–1319. The PERA is nearly identical to the POFERA and is likewise administered by the PERB, but the PERA applies to certain non-police and -firefighter public employees. *See* 19 *Del. C.* §§ 1301, 1302(o), 1306.
[106] Answering Br. of Appellee-Below Appellee Fraternal Order of Police, Lodge 1 at 35. I note, however, that individual CBAs may include bargained-for parity provisions. *See generally Wilmington Firefighters Ass'n, Local 1590 v. City of Wilmington*, 2002 WL 418032 (Del. Ch. Mar. 12, 2002).

fees, charges or other sources of revenues."[107]   Based on this principle, the FOP

now contends that "there is not any difference in the meaning of the phrase . . .

whether viewed prospectively or retrospectively; instead, the issue is whether,

*based upon existing revenue in the years under consideration*, operating surpluses

did (retrospectively) or will (prospectively)[,] without mandating an increase[,]

exist to fund the award."[108]

### 3. Recurring Costs of the FOP's LBFO

The City argues that, in determining the "costs of any proposed settlements"

as required by Section 1615(d)(6), the Arbitrator and the PERB should have

included costs for fiscal years following the effective term of the FOP's LBFO, at

the very least for FY 2015.  According to the City, although the FOP's proposed

CBA expires in FY 2014, the salary increase it contains will actually carry over

into FY 2015 because the parties already have such a late start on negotiating a

successor CBA, and therefore the Arbitrator and the PERB were obligated to

include FY 2015 costs in the total cost of the FOP's proposal.[109]   The City

contends that the Arbitrator's characterization of the its projected FY 2015 costs as

"purely speculative," "overly simplistic," and "not persuasive" ignores the realities

that arbitration decision was issued two months after—and the PERB decision four

---

[107] Supplemental Mem. of Appellee-Below, Appellee Fraternal Order of Police Lodge #1 at 12–13.
[108] *Id.* at 13 (emphasis added).
[109] *See* City of Wilmington's Opening Br. in Supp. of Its Appeal at 18–20.

months after—the expiration of the term of the FOP's proposal; that the "law requires that any step increases be maintained pending the negotiation of a successor agreement;" that the "FOP almost certainly will not agree to roll back the increases;" that "[i]n the absence of agreement to roll back the increases, it normally takes at least several months to negotiate an impasse;" that the "parties must then go through mediation;" and that it took in this case "over 8 months from the initiation of binding interest arbitration to get a decision."[110]

The FOP does not directly address in briefing the issue of whether salary costs for FY 2015 must be included in the total costs of the FOP's LBFO. Instead, it argues that, in any event, "the Arbitrator clearly considered the $57,010 estimated costs for FY 2015 in light of the more than $5 million cash in the Unassigned Fund [Balance] and the projected operating surplus of $1,125,905 for FY 2015."[111]

## II. STANDARD OF REVIEW

"On appeal of an administrative agency's adjudication, this Court's sole function is to determine whether the [agency]'s decision is supported by substantial evidence and is free from legal error."[112] The issues on appeal here are purely

---

[110] *Id.* at 19–20.

[111] Answering Br. of Appellee-Below Appellee Fraternal Order of Police, Lodge 1 at 34. I note that the FOP has since stipulated that the projected surplus in FY 2015 was $1,400,905.

[112] *Fraternal Order of Police, Lodge 5 v. New Castle Cnty.*, 2014 WL 351009, at *4 (Del. Ch. Jan. 29, 2014) (quoting *Angstadt v. Red Clay Consol. Sch. Dist.*, 4 A.3d 382, 387 (Del. 2010)).

legal and, as such, are subject to this Court's *de novo* review.[113]   In undertaking

such a review, the Court is mindful of the PERB's expertise and specialized

competence in labor law.[114]   However, the Court ultimately "remains obligated to

conduct a plenary review of a PERB decision when the issue is the proper

construction of statutory law and its application to undisputed facts."[115]

   "Delaware courts do not accord agency interpretation of the statutes which

they administer so-called *Chevron* deference, as do federal courts in reviewing

administrative decisions under the federal Administrative Procedures Act."[116]   In

interpreting a statute, Delaware courts must "ascertain and give effect to the intent

of the legislature."[117]   If the statute is clear and unambiguous, "then the plain

meaning of the statutory language controls."[118]   The parties' disagreement as to the

meaning of the statute alone does not create an ambiguity.[119]   "Rather, a statute is

ambiguous only if it 'is reasonably susceptible [to] different interpretations,' or 'if

a literal reading of the statute would lead to an unreasonable or absurd result not

---

[113] *E.g.*, *id.*; *Fraternal Order of Police No. 15 v. City of Dover*, 1999 WL 1204840, at \*2 (Del. Ch. Dec. 10, 1999).

[114] *See, e.g.*, *Fraternal Order of Police, Lodge 5,* 2014 WL 351009, at 4 ("In undertaking such a review the Court accords due weight to PERB's expertise and specialized competence in labor law." (internal quotation marks omitted)); *Fraternal Order of Police No. 15*, 1999 WL 1204840, at \*2 ("[T]he Court is not unmindful that the agency whose decision is being reviewed is an expert one functioning in an area that requires or at least is greatly aided by such expertise." (internal quotation marks omitted)).

[115] *Fraternal Order of Police, Lodge 5*, 2014 WL 351009 at \*4.

[116] *Id.* (internal footnote and quotation marks omitted).

[117] *Del. Bay Surgical Servs. v. Swier*, 900 A.2d 646, 652 (Del. 2009) (citations omitted).

[118] *Ins. Comm'r of State of Del. v. Sun Life Assurance Co. of Can. (U.S.),* 21 A.3d 15, 20 (Del. 2011).

[119] *E.g.*, *Chase Alexa, LLC v. Kent Cnty. Levy Ct.*, 991 A.2d 1148, 1151 (Del. 2010).

contemplated by the legislature.'"[120] If a statute is ambiguous, the Court should

consider the statute as a whole, rather than in parts, reading each section in light of

all others to produce a harmonious whole.[121] The Court should also "ascribe a

purpose to the General Assembly's use of statutory language, and avoid construing

it as superfluous, if reasonably possible."[122] I apply these precepts to the case at

hand as follows.

## III. ANALYSIS

The scope of this appeal is narrowly focused. In it, the Court is asked to

interpret various provisions within 19 *Del. C.* § 1615(d)(6) and to determine, in

light of the statute's meaning, whether the Arbitrator, and thus the PERB, properly

administered the law in resolving the parties' dispute. As explained below, I

reverse the PERB's decision in part and affirm it in part.

> *A. The Arbitrator and the PERB Erred as a Matter of Law in Ruling that the Cash Assets Accounted for by the Unassigned Fund Balance Are Existing Revenues*

I turn first to whether the Arbitrator and the PERB mischaracterized the

Unassigned Fund Balance as "existing revenues," as that term is used in Section

1615(d)(6). As a preliminary matter, I note that the scope of the Arbitrator's and

---

[120] *Fraternal Order of Police, Lodge 5*, 2014 WL 351009 at *4 (quoting *Centaur Partners, IV v. Nat'l Intergroup, Inc.,* 582 A.2d 923, 927 (Del. 1990); *LeVan v. Independence Mall, Inc.,* 940 A.2d 929, 933 (Del. 2007)).

[121] *E.g.*, *Fraternal Order of Police, Lodge 5*, 2014 WL 351009 at * 4 (citing *Taylor v. Diamond State Port Corp.,* 14 A.3d 536, 538 (Del. 2011)).

[122] *Id.* (citing *Diamond State Port Corp.*, 14 A.3d at 538)).

34

the PERB's holdings in this regard is unclear.  In her decision, the Arbitrator ruled

that the "[U]nassigned [F]und [B]alance does not constitute a *reserve*," but she

never expressly spoke to whether the Unassigned Fund Balance constitutes *existing*

*revenues*, perhaps interpreting the holding in *City of Seaford* to create a dichotomy

between the two terms, under which all cash assets are either "reserves" or

"existing revenues."[123]  Her ruling is also clearly directed towards the *entire*

Unassigned Fund Balance, though she does note at the beginning of her analysis

that the Unassigned Fund Balance is only partly composed of cash assets.[124]  In

affirming the Arbitrator's decision, however, the PERB appears to take the

Arbitrator's ruling further, portraying the Arbitrator as having implicitly held that

the *cash assets* accounted for by the Unassigned Fund Balance constitute *existing*

*revenues,* and itself endorsing this more specific position.[125]  In any event, I need

not consider how to resolve this discrepancy between the decisions, because the

parties have proceeded in this appeal as if both the Arbitrator and the PERB held

---

[123] *See* R. 1368.
[124] *See* R. 1366–67, 1368.
[125] *See* R. 1430 ("The Arbitrator explicitly determined that the Unassigned Fund Balance was not a reserve; consequently, it is not excluded as 'existing revenues' under *Seaford*.  We Concur. The Arbitrator determined, based on the City's evidence, [that] the Unassigned Fund Balance constitutes the account or fund in which the City accumulates its excess revenues and from which the City draws funds to meet unanticipated or unfunded expenses in its budget. . . .  There is no question that the Unassigned Fund Balance Balance's cash or cash equivalent is comprised of funds from existing revenues.  It is and has been a stable source of funding.").

that cash assets accounted for in the Unassigned Fund Balance constitute existing revenues.[126] Thus, that is the specific issue I will consider here.

In order for a binding interest arbitrator to force a public employer to enter into any CBA with a police officers' or firefighters' union, Section 1615(d) of the POFERA requires that the public employer have the financial ability to meet the costs of the CBA. Section 1615(d)(6) provides that the financial ability of the public employer is to be determined solely "based on [the public employer's] existing revenues." The FOP argues that the Arbitrator and the PERB correctly determined that, as a matter of law, all of the cash assets accounted for by the Unassigned Fund Balance constitute existing revenues, principally because these assets are made up of prior years' surplus revenues. The City contends that these rulings constituted legal error because the Unassigned Fund Balance is a reserve or, in the alternative, because only revenues from the year or years that the costs of the proposed CBA are to actually be incurred by the City may constitute existing revenues. I do not find either party's argument fully persuasive, but I ultimately agree with the City that the Arbitrator and the PERB erred as a matter of law in

---

[126] *See, e.g.*, City of Wilmington's Opening Br. in Supp. of its Appeal at 10 ("Second, the decisions incorrectly determine [that] the cash assets in the Unassigned Fund Balance are existing revenues."); *cf.* Answering Br. of Appellee-Below Appellee Fraternal Order of Police Lodge 1 at 34 ("Accordingly, based upon the evidence presented, the authorities referenced and the rationale applied thereto, FOP #1 submits that the Arbitrator and the [PERB] properly found that cash in the Unassigned Fund Balance represents surplus revenue (not an explicitly-allocated protected reserve).").

ruling that the cash assets accounted for in the Unassigned Fund Balance categorically constitute existing revenues.

### 1. Revenues, Reserves, and Existing Revenues

In conducting my analysis under this issue, I am guided by this Court's decision in *Fraternal Order of Police, Lodge 5*. There, the court reviewed a PERB decision affirming an arbitrator's ruling that New Castle County could not meet the costs of a union's LBFO. En route to her conclusion, the arbitrator below ruled that certain assets held in reserves by the County did not constitute existing revenues under Section 1615(d)(6) and, ultimately, that the County did not have sufficient existing revenues to meet the costs of the union's proposal because budget forecasts indicated that County would run a deficit in the two fiscal years covered by the proposal, FY 2012 and FY 2013.[127] In analyzing whether the arbitrator properly applied the statutory standard under Section 1615(d)(6), the court noted that the arbitrator below had relied on the following discussion of revenues, reserves, and the statutory term "existing revenues" previously set forth in the *City of Seaford* arbitration decision:

> Revenue is dynamic in character. It constitutes a flow of moneys, in this case, into the City[ of Seaford]'s coffers. Revenues from the electricity, water and sewer enterprise funds consist of net income (operating and non-operating revenues less operating expenses), or "profits" in the vernacular. Included in the non-operating revenues is

---

[127] *See Fraternal Order of Police, Lodge 5*, 2014 WL 351009, at *8–10.

37

"interest earned" which may include interest earned on the investment of reserved funds.

Reserves, on the other hand, are moneys which have been set aside, saved, or "reserved." While they may originate from excess revenues and be allocated to reserves in a given year, they do not constitute an active revenue stream. Funds are reserved or allocated to reserves through an affirmative act of the governing body. Likewise, how those reserves are expended, invested, or allocated is also within the exclusive authority of the City's governing body.

The term "existing revenues" limits the Interest Arbitrator to considering revenues, based on existing fee and taxation rates. It is beyond the scope of the Arbitrator's authority to consider whether such rates should or could be increased, whether other expenses should or could be decreased or reallocated, and/or whether existing reserves should or could be allocated to fund the proposals. While it is certainly within the authority of the governing body of a public employer to make any of these choices subject to the political will of its citizenry, it is not within the province of the Interest Arbitrator under the [POFERA].[128]

After conducting its own review of the POFERA, the *Fraternal Order of Police, Lodge 5* court concluded that the *City of Seaford* arbitrator's "discussion of what constitutes 'existing revenues' within the meaning of 19 *Del. C.* § 1615(d)(6) is well-reasoned and persuasive," and specifically that the "arbitrator's approach was guided by, and consistent with, this Court's precedent regarding statutory interpretation."[129] Based on the *City of Seaford* arbitrator's definitions, as well as

---

[128] *Fraternal Order of Police, Lodge 5*, 2014 WL 351009 at *6 (quoting *City of Seaford v. Fraternal Order of Police, Lodge 9*, IV PERB 2659, 2675–76 (July 15, 2002) (Decision of the Interest Arbitrator on Remand)).

[129] *Id.* at *6. Specifically, the court praised the *City of Seaford* arbitrator's decision to give words of common usage in a statute their "usual, ordinary and natural meaning" where the statute's language is clear. *See id.* at *6 n.31 (pointing to the arbitrator's citation of and reliance on

its independent analysis of the POFERA, the court adopted the *City of Seaford* arbitrator's conclusion that, "based on the plain meaning of the word 'revenues,' the POFERA excludes unambiguously a public employer's financial reserves from consideration in an analysis under Section 1615(d)(6)."[130] Further, the court affirmed the arbitrator's and the PERB's decisions that the County could not meet the costs of the union's LBFO based on existing revenues, concluding that it was appropriate for the arbitrator in its analysis under Section 1615(d)(6) to focus on the County's revenues in the fiscal years covered by the LBFO, and specifying that the proper inquiry is whether those years' revenues are sufficient in the aggregate to meet the costs of that LBFO, *i.e.*, whether there are sufficient revenues over the entire term of the LBFO to meet the total costs of the LBFO, as opposed to sufficient revenues in each individual year of the LBFO to meet the respective costs in each individual year of the LBFO:

> Even assuming that the FOP 5 is correct that no reasonable arbitrator could have concluded that the County was unable to afford FOP 5's proposal for the 2012 fiscal year, there is no evidence that the County could have paid for the proposal in fiscal year 2013. Each

---

*Haddock v. Bd. of Pub. Educ. in Wilm.*, 84 A.2d 157, 161 (Del. Ch. 1951) and *Seaford Bd. of Educ. v. Seaford Sch. Dist.*, 1988 WL 8773, at *2 (Del. Ch. Feb. 5, 1988)); *see also City of Seaford*, IV PERB at 2673. As noted by the court, the arbitrator relied on the dictionary definitions of "revenues" as meaning "the yield of income that a political unit collects and receives into the treasury for public use," and of "income" as meaning "a gain or recurrent benefit, usually measured in money that derives from capital or labor; also, the amount of such gain received in a period of time." *Fraternal Order of Police, Lodge 5*, 2014 WL 351009 at *5 n.28; *see also City of Seaford*, IV PERB at 2674 (quoting *Merriam Webster's Collegiate Dictionary* 558, 1002 (10th Ed. 1996)).
[130] *Fraternal Order of Police, Lodge 5*, 2014 WL 351009 at *6.

party submitted a two-year proposal to the Arbitrator. Therefore, the relevant inquiry was whether the County could afford FOP 5's proposal throughout its entire two-year duration. The County submitted unchallenged evidence that it was projecting a $5.1 million deficit in the 2013 fiscal year if FOP 5 accepted the 2.5% concession and a $5.7 million deficit if it did not. An actual deficit of even half that amount would have exceeded the County's projected 2012 budget surplus. Because a reasonable arbitrator could have found the County's budget forecasts credible, it follows that the record before the Arbitrator and the PERB contained evidence sufficient to support a reasonable determination that the County could not afford to pay for the FOP 5's proposal over the entirety of its two-year duration.[131]

### 2. The Unassigned Fund Balance Is Not a Reserve

Based on the bright-line rule set forth in *Fraternal Order of Police, Lodge 5,* the City argues that the assets accounted for by the Unassigned Fund Balance meet the *City of Seaford*'s criteria for reserves and thus categorically cannot be considered existing revenues. That argument, however, is without merit.

As made clear by the Director of the OMB, Robert Greco, in the arbitration proceedings, the Unassigned Fund Balance is not a specific account or set of accounts wherein assets are held, but rather it is an accounting function that tallies net assets of a certain classification across the General Fund. The City Council does not and cannot set aside, save, or reserve assets in the Unassigned Fund Balance through an affirmative act, because the Unassigned Fund Balance is just a numerical value that exists only on the City's financial statements. It is not even a value that accounts for assets in the General Fund that the City Council has set

---

[131] *Id.* at *10.

aside, saved, or reserved through an affirmative act; rather, the specific parameters of the Unassigned Fund Balance exclude such assets from being included in its value.  Put simply, the Unassigned Fund Balance is no more than a tally of net assets in the General Fund not allocated to be spent or placed in a reserve. Therefore, I do not find that the Unassigned Fund Balance is itself a reserve, nor can any of the assets for which it accounts be considered reserves.

### 3. The Cash Assets Included in the Unassigned Fund Balance Are Not "Existing Revenues"

Just because the cash assets included in the Unassigned Fund Balance are not reserves, however, does not necessarily mean that they are "existing revenues." Neither *Fraternal Order of Police, Lodge 5* nor *City of Seaford* imposes a rule that a specific asset must either be a reserve or existing revenue, only that any reserved asset cannot be considered existing revenue.  Thus, it is appropriate to independently consider whether the cash assets included in the Unassigned Fund Balance are "existing revenues."

The FOP initially argued, consistent with the rulings of the Arbitrator and the PERB, that the cash assets included in the Unassigned Fund Balance are "existing revenues" because the source of the Unassigned Fund Balance is revenues; it points out that the Unassigned Fund Balance is merely the accumulation of prior years' surplus revenues.  This surely is true, but it also highlights the problem with the Arbitrator's and the PERB's' reasoning.

41

"Revenue" inherently involves a temporal aspect: It is the amount of money an entity receives *over a specific period of time*.[132] This is what is meant by the arbitrator's observation in *City of Seaford* that "[r]evenue is dynamic in character" and that "[i]t constitutes a flow of moneys, in this case, into the City[of Seaford's] coffers."[133] The magnitude of that movement cannot be calculated in a vacuum; there must be a definitive beginning and ending point for the calculation. Hence, the Arbitrator and the PERB are correct that the cash assets in the Unassigned Fund Balance *originated as* revenues during certain periods of time in the past, but they are incorrect to say that those assets *are* categorically revenues in the present.[134]

The modifier "existing" does not change this ordinary, temporal meaning of revenues such that "existing revenues" becomes a static concept. As the arbitrator in *City of Seaford* illuminated, and as the FOP acknowledges in its supplemental briefing, the modifier "existing" merely limits the scope of potential revenues that

---

[132] *See id.* at *5 & n.28 (noting that the arbitrator in *City of Seaford* relied on the dictionary definitions of "revenues" as "the yield of income that a political unit collects and receives into the treasury for public use," and "income" as "a gain or recurrent benefit, usually measured in money that derives from capital or labor; also, the amount of such gain received in a period of time"); *see also City of Seaford*, IV PERB at 2674 (quoting *Merriam Webster's Collegiate Dictionary* 558, 1002 (10th Ed. 1996)).

[133] *Fraternal Order of Police, Lodge 5*, 2014 WL 351009 at *6.

[134] This distinction is further highlighted by basic principles of accounting. An entity records its revenues in an income statement, which tracks profitability of the entity over a specified *period* of time, based on the entity's revenues and expenditures over that period. The entity's balance sheet—wherein the Unassigned Fund Balance is found—does not record revenues; rather, it provides a snapshot of the entity's financial position at a specific *point* in time, based on the entity's assets and liabilities at that moment.

the arbitrator may consider in gauging the City's financial ability to meet the costs of any proposal.[135]   Specifically, the term "existing revenues" confines the arbitrator's analysis to revenues that are "based on existing fee and taxation rates" as a means to prevent the arbitrator from overriding the Council's legislative authority to raise, appropriate, and set aside funds.[136]   It ensures, in other words, that the arbitrator does not usurp this core legislative function; it requires that the arbitrator take into account the information available at the time of the arbitration and, based on that information, consider only those revenues that have already been ordained by the City.  In looking at that snapshot of information, however, the arbitrator cannot identify any particular revenues without first narrowing her search to a specific period of time, the time to be covered by the LBFO.  In other

---

[135] *See id.* ("The term 'existing revenues' limits the Interest Arbitrator to considering *revenues*, based on existing fee and taxation rates." (emphasis added) (quoting *City of Seaford,* IV PERB at 2675)); Supplemental Mem. of Appellee-Below, Appellee Fraternal Order of Police Lodge #1 at 11–13.

[136] *See Fraternal Order of Police, Lodge 5*, 2014 WL 351009 at *6 ("It is beyond the scope of the Arbitrator's authority to consider whether such rates should or could be increased, whether other expenses should or could be decreased or reallocated, and/or whether existing reserves should or could be allocated to fund the proposals.  While it is certainly within the authority of the governing body of a public employer to make any of these choices subject to the political will of its citizenry, it is not within the province of the Interest Arbitrator under the [POFERA]." (quoting *City of Seaford,* IV PERB at 2675–76)); Supplemental Mem. of Appellee-Below, Appellee Fraternal Order of Police Lodge #1 at 12–13 ("[T]here is not any legislative history that the adjective "existing" in the phrase 'existing revenue' was intended to have any meaning different from it[s] dictionary meaning 'in existence or operation at the time under consideration, current.' . . . [T]he only reasonably conclusion is that Delaware substituted the phrase 'based on existing revenues' as a shorthand method of indicating that any award cannot mandate an increase or imposition of new taxes, fees, charges or other sources of revenue, the imposition of which remains in the discretion of the legislative body[,] but, instead, financial ability to pay must be based upon existing or proposed revenue, *i.e.*, taxes, fees, charges or other sources of revenue.").

words, "existing revenues" are still "revenues;" they are still "dynamic in character" and can only be ascertained in reference to a specific span of time.

An analogy may help to clarify the point. Consider two retirees on a fixed pension: In year *X*, Retiree *A* receives $60,000 per year and has no productive assets; Retiree *B* receives $50,000 per year and has $500,000 invested with a fixed return of 2%. What are the revenues of Retiree *A* and Retiree *B* in year *X*? Both have a dynamic inflow of funds of $60,000; this is their revenue. Retiree *B* has saved half a million dollars from past income—past revenue—and is undeniably wealthier than Retiree *B*, but revenue in year *X* to each is the same. The fact that many years ago Retiree *B* had revenue streams from which, unlike Retiree *A*, he retained a surplus does not make that surplus part of his revenue in year *X*, although the interest which flows to him each year from that surplus is revenue.

The Arbitrator's and the PERB's decisions ignore the plain meaning of the word "revenues" by categorically applying the term "existing revenues" to the cash assets accounted for by the Unassigned Fund Balance as those assets presently exist in static form in various accounts across the General Fund, without regard to when those assets actually flowed to the City.[137] In doing so, the Arbitrator and the PERB conflate "existing assets" with "existing revenues." It may be true that the City itself can, and occasionally has, used its existing assets to finance

---

[137] *See, e.g.*, R. 1430 ("Nothing in the statute requires that the consideration of revenues be limited to the current fiscal year or to any other specific, limited period of time.").

44

expenditures—both through the Mayor including prior years' accumulated surplus in the City's revenue projections and the Council appropriating prior years' accumulated surplus to make modifications to the budget—but the potential for these assets to be expended does not make them revenues. "Revenue" refers to a flow *in* over a given time, not a flow *out.* Rather, assets accounted for by the Unassigned Fund Balance, like any City asset, can be considered part of the City's projected revenues only after the City has opted to appropriate them for future expenditures, which authority is left to the discretion of the Mayor and the Council, and not the arbitrator, under the City's Charter.

I note that, although neither the Arbitrator's decision nor the PERB's decision expressly say so, their holdings could be interpreted to imply that an arbitrator should graft onto the POFERA an understanding that, specifically with respect to arbitration awards for periods in the past, all prior years' revenues, including those now accounted for by the Unassigned Fund Balance, be available as "existing revenues," since the arbitrator could find that the LBFO can be satisfied using these assets without changes in taxing/spending policy on the part of the City. I reject that implication. Nothing in the POFERA as interpreted by our caselaw is ambiguous here so as to allow departure from the statute's express language; as I describe in my analysis below,[138] the revenues from years covered

---

[138] *See infra* Part III.A.4.

by the FOP's LBFO are easily ascertainable and form the outer limit of the permissible cost, and nothing about that result is absurd or unworkable.[139]

Because the cash assets accounted for by the Unassigned Fund Balance are not "existing revenues" within the meaning of Section 1615(d)(6), I find that the Arbitrator and the PERB committed legal error by holding otherwise.

### 4. "Existing Revenues" Are Those Revenues the City Received During the Term of the Proposed CBA

Having found that calculation of "existing revenues" inherently requires consideration of a specific period of time, however, the question remains as to what specific period of time the Arbitrator should have considered here in gauging whether the City had the financial ability to meet the costs of the FOP's LBFO. As noted above, in the *Fraternal Order of Police, Lodge 5* decision, this Court—as well as the arbitrator and the PERB below—held that the "relevant inquiry" under Section 1615(d)(6) in the context of arbitrating CBAs governing future years

---

[139] Even if I were to interpret the statute as ambiguous with respect to past application, the result would be the same. Employing the principle of interpretation found in *Seaford Bd. Of Educ. v. Seaford Educ. Ass'n*, 1988 WL 8773, at *2 (Del. Ch. Feb. 5, 1988), *see infra* note 142 and accompanying text, I do not find that the term "existing revenues" should be reinterpreted to include the cash assets included in the Unassigned Fund Balance in the limited context of arbitrating retroactive CBAs. Section 1615(d)(6) is designed as a control on the collective bargaining process to ensure that the costs of any proposal the public employer is forced to accept is commensurate with the public employer's financial condition during that period, as set by the governing legislative body. If the arbitrator were to analyze a union's request for retroactive salary increases based on the public employer's prior years' accumulated surplus, it would allow the union to spread the costs of its proposal over years beyond those actually covered by the proposal, granting the union an advantageous bargaining position to which it would not be entitled when arbitrating a CBA for future years. Such an interpretation would create an incentive for the unions to delay negotiations on CBAs and thus would be inconsistent with the purpose of the POFERA.

involves net existing revenues over the contract period; that is, "whether the [public employer] could afford [the union's] proposal throughout its entire . . . duration."[140]  However, also as noted above, the situation here is complicated by the fact that the parties are negotiating a retroactive CBA.

The City makes the argument—for the first time in supplemental briefing—that the POFERA reference to "existing revenues" can have no logical application to past, as opposed to prospective, periods of employment.  According to the City, the restriction on the arbitrator to choose an offer that can be satisfied from existing *projected* revenues prevents the arbitrator from impinging on a core legislative function, but applying the term to *past* revenues would actually *cause* the arbitrator to impinge on that function.  Specifically, the City argues that applying the "existing revenues" standard retroactively "leads to an unreasonable result as it would require the public employer to set aside surplus revenues in prior years in the event there is a subsequent [POFERA] proceeding, and the arbitrator determines the surplus constitutes 'existing revenues' available to pay for a retroactive proposal."[141]  Better, according to the City, to judicially rewrite the statute to impose the revenue restriction on the future year or years in which the payment for work in the past will be paid.  I reject this argument.

---

[140] *Fraternal Order of Police, Lodge 5*, 2014 WL 351009 at *10.
[141] City of Wilmington's Supplemental Mem. of Law in Supp. of Its Appeal at 9.

47

It is true that the POFERA is clearly designed in contemplation that public employers and unions will collectively bargain over CBAs to govern their future relationships. However, that does not mean that the revenue restriction cannot, or should not, be applied retrospectively. In situations where it is "reasonably plain that the legislature had no specific intention with respect to the specific problem that later arises," this Court has found that "the best technique to employ—the one most consistent with the special, limited judicial role in our democracy—is for the court to interpret the words used, in a manner consistent both with their ordinary usage and with the discernible overall intent of the statute."[142] Employing that principle of statutory interpretation here, it is clear that the City's interpretation would lead to an unreasonable result. If the arbitrator were to analyze a union's request for retroactive salary increases based on the public employer's budget in the year that it is to make those retroactive payments, it would constrict the union's ability to obtain raises over multiple years to the revenues that the public employer can generate in a single year, granting the public employer an advantageous bargaining position to which it would not be entitled when arbitrating CBAs for prospective terms of employment. Such an interpretation would create an

---

[142] *Seaford Bd. Of Educ. v. Seaford Educ. Ass'n*, 1988 WL 8773, at *2 (Del. Ch. Feb. 5, 1988).

incentive for public employers to delay negotiations on CBAs and thus would be inconsistent with the purpose of the POFERA.[143]

Instead, I see no reason to depart from this Court's position in *Fraternal Order of Police, Lodge 5* that "existing revenues" refers to the revenues in the fiscal years covered by the proposed CBA, taken as a whole.[144] Not only is this interpretation consistent with the plain meaning of the statute's language and with prior precedent of this Court interpreting that language, it also maintains, more than any other interpretation offered by the parties or the decisions below, the public employer's and the union's respective bargaining positions in arbitrations over retroactive CBAs as those positions already exist under the POFERA in arbitrations over CBAs for prospective terms of employment. The key difference between the two situations is that in arbitrations over retroactive CBAs the arbitrator will be guided by actual revenue figures for the years covered by the proposal, as opposed to revenue projections for those years. However, it does not seem to me that this difference inherently favors either the public employer or the union in the collective bargaining process.

---

[143] For a discussion of the analogous incentive problem arising from the FOP's (initial) argument that all prior years' surpluses should be available for retroactive CBAs, see *supra* note 139.
[144] That is, for a LBFO to be paid out of the General Fund, the arbitrator must consider whether or not the public employer could pay the net costs of the contract envisioned by the LBFO from the net of actual and/or projected annual operating surpluses or deficits—"existing revenues"—in the General Fund during the years that contract would be in existence.

Furthermore, I do not find persuasive the City's argument that applying a revenue restriction for retroactive CBAs based on prior years' revenues improperly allows the arbitrator to intrude on the core legislative functions of the City's elected officials by "[e]ffectively requiring the City to set aside surpluses in prior fiscal years."[145] The City's concern is not unique to arbitrations over retroactive CBAs. It is unchallenged that an arbitrator's decision may require a public employer to pay for the costs of CBAs covering future years out of surplus revenues that the public employer is projected to receive in those years, and thus may, under the City's reasoning, effectively require the public employer to "set aside" those future revenues for a specific use as they are obtained. If anything, there is actually *less* of a concern that using net surplus revenues over the years covered by the contract as a basis for Section 1615(d)(6) will cause an arbitrator to impinge on a core legislative function in the context of retroactive CBAs, considering that revenues and expenses in prior years are definitively known, as opposed to forecasted, and thus the arbitrator cannot overestimate the public employer's financial ability. Rather, what the City is actually arguing is that applying the approach laid out in *Fraternal Order of Police, Lodge 5* in arbitrations over retroactive CBAs will effectively tie up a portion of the City's surplus assets. I note that such a consequence is not necessarily unreasonable nor

[145] City of Wilmington's Supplemental Mem. of Law in Supp. of Its Appeal at 9.

should it be unexpected, considering that, in situations where collective bargaining on a successor CBA has lagged past the termination of the previous CBA, the City is aware that its cost of labor for these employees is unsettled and, because that cost is set at a time in the past, likely deflated. In any event, the City's concern does not find support in the language or the underlying purpose of the POFERA.

Therefore, I find that the term "existing revenues" in Section 1615(d)(6) required the Arbitrator in this situation to analyze the City's financial ability to meet the costs of the FOP's LBFO using the City's revenues in the General Fund over the duration of the four years covered by that proposal, FY 2011 to FY 2014.

> *B. The Arbitrator and the PERB Erred as a Matter of Law in Ruling on the City's Financial Ability to Meet the Costs of the FOP's LBFO Based on Factors Other than Existing Revenues*

Having found that the term "existing revenues" refers here to the period covered by the FOP's LBFO, I turn next to whether the Arbitrator and the PERB applied an improper standard to gauge the City's financial ability to meet the costs of the FOP's LBFO. As a preliminary matter, I note that it is not clear exactly how the Arbitrator reached her conclusion that the City did not have "an inability to afford the costs of the FOP's last, best, final offer." The Arbitrator did not detail the calculation that she used or the specific figures upon which she relied for her conclusion, only that she had reached that conclusion "[f]or all the[] reasons" set out over the previous seven pages of the decision. For instance, at the beginning of

51

her analysis, the Arbitrator noted that the FOP had only asked for salary increases for Bargaining Unit members in "FY 2012 and FY 2013, years in which the City accrued surpluses and increased its unassigned fund balance," and that "[t]he revenue, expenditure and fund balances are known for FY 2011 through FY 2014, with the FY 2014 unassigned fund balance projected to be $28,520,703, which includes $5,699,343 in cash,"[146] but the decision is silent as to whether—and if so, how—any of these pieces of information factored into her final decision that the City could afford the FOP's proposal; nor does the decision explain how the projected savings of approximately $107,606 in FY 2014 from certain vacancies within the City's police force factored into the Arbitrator's decision.[147]

However, assuming, as the PERB appears to in its decision[148] and as the parties do in briefing,[149] that the Arbitrator based her ruling that the City could "afford" the FOP's LBFO solely on the $5,699,343 in cash assets that was projected to be included in the Unassigned Fund Balance at the expiration of FY 2014, I find that the Arbitrator and the PERB did not apply the standard required

---

[146] R. 1367.

[147] *See* R. 1371.

[148] *See* R. 1430 ("The Arbitrator determined, based on the City's evidence, [that] the Unassigned Fund Balance constitutes the account or fund in which the City accumulates its excess revenues and from which the City draws funds to meet unanticipated or unfunded expenses in its budget. . . . There is no question that the Unassigned Fund Balance Balance's *cash or cash equivalent* is comprised of funds from existing revenues. It is and has been a stable source of funding." (emphasis added)).

[149] *See, e.g.*, City of Wilmington's Opening Br. in Supp. of Its Appeal at 10, 15–16; Answering Br. of Appellee-Below Appellee Fraternal Order of Police, Lodge 1 at 34.

by Section 1615(d)(6). As I have found above, the Arbitrator and the PERB should have evaluated the City's financial ability to meet the costs of the FOP's LBFO based on whether the City generated sufficient revenues in the General Fund from FY 2011 to FY 2014.

*C. The Arbitrator and the PERB Did Not Err as a Matter of Law in Holding that FY 2015 Costs Should Not Be Included in the Total Projected Costs of the FOP's LBFO*

Finally, I turn to the issue of whether FY 2015 costs—and perhaps those from succeeding years as well—should be included in the total projected costs of the FOP's LBFO. Section 1615(d)(6) requires the Arbitrator and the PERB to consider "[t]he financial ability of the public employer, based on existing revenues, *to meet the costs of any proposed settlements*."[150] The City argues that, as a matter of law, "costs of any proposed settlements" must be interpreted to include costs of a proposed CBA in non-contract years where, like here, the terms of the proposed CBA will realistically continue into those non-contract years. As support for its interpretation, the City cites a passage from *City of Seaford* wherein the arbitrator was describing the rationale underlying using "existing revenues" to qualify the City's financial ability meet the costs of any proposal, which passage was cited

---

[150] 19 *Del. C.* § 1615(d)(6) (emphasis added).

53

favorably by this Court in *Fraternal Order of Police, Lodge 5 v. New Castle County*[151]:

> There is a very clear and logical reason the General Assembly limited the Interest Arbitrator to consider only "existing revenues" in reaching a determination as to whether a public employer can afford a proposed settlement. Many costs, including those for wages and benefits, are recurring and generally tend to automatically increase annually, either as a result of negotiated provisions of a collective bargaining agreement or due to inflationary pressure on the costs of services or goods an employer has agreed to provide. Consequently, they constitute an on-going and frequently increasing financial obligation.[152]

According to the City, because the parties do not have a CBA in place to succeed the FOP's proposed CBA and are unlikely to have one in place by the end of FY 2015, and because the City must, by law, honor the terms found in the last year of the parties' previous CBA until a successor CBA can be executed, the salary increases in the FOP's LBFO will actually be "on-going," "recurring," and "automatically" continued through at least FY 2015, and thus are the type of costs envisioned by Section 1615(d)(6). I do not find this argument persuasive.

The POFERA does not define the phrase "costs of any proposed settlement" as it appears in Section 1615(d)(6), nor does its twin, the PERA, define the phrase as it appears in identical form in Section 1315(d)(6),[153] nor does this Court's

---

[151] 2014 WL 351009 (Del. Ch. Jan. 29, 2014).

[152] *Id.* at *6 (quoting *City of Seaford v. Fraternal Order of Police, Lodge 9*, IV PERB 2659, 2676 (July 15, 2002) (Decision of the Interest Arbitrator on Remand)).

[153] *See* 19 *Del. C.* § 1615(d)(6).

limited caselaw reviewing PERB decisions under either of these acts define the phrase. The dictionary definition of "cost" is "the amount or equivalent paid or charged for something."[154] Based on the plain meaning of "cost," the phrase "costs of any proposed settlement" is unambiguous; it can only be reasonably interpreted to mean the amount of money the City would necessarily expend in order to satisfy its obligations under the proposed CBA. It unambiguously does not include costs of the City's obligations following the expiration of the proposed CBA, *i.e.*, the amount of money the City will have to expend until the parties execute a different, successor agreement. In other words, the fact that the City's costs to operate within the law in the absence of a CBA may be initially determined by the terms of the parties' previous CBA does not mean that those are "costs of" the previous CBA.

My conclusion in this regard is supported by the fact that, even if the City is forced to provide pay and benefits to the Bargaining Unit employees in FY 2015 based on the FY 2014 levels in the FOP's LBFO, the parties must still negotiate and adopt a new CBA to retroactively govern FY 2015, which new CBA will dictate the *actual* salaries and benefits the employees were entitled to in FY 2015,

---

[154] *Webster's II New College Dictionary* 255 (1995); *see also Black's Law Dictionary* (10th ed. 2014) (defining "cost" as "the amount paid or charged for something; price or expenditure").

and thus the City's *actual* costs in FY 2015.[155]  The City's plea for pragmatism, that the Court can be assured that collective bargaining will yield costs in FY 2015 at least on level with FY 2014 because the Bargaining Unit will never agree to retroactively reduce salaries and benefits, is also unavailing, considering the Bargaining Unit will not be entitled to retain FY 2014 salaries and benefits in any successor CBA under Section 1615(d)(6) if the City does not have sufficient revenues to meet those costs during the period of the successor CBA.[156]  Even if the City can meet those costs in retrospect, the salaries and benefits will still be subject to evaluation under the seven factors in Section 1615(d).  Thus, while I have no doubt that the City will face resistance in any effort to claw back salaries and benefits in FY 2015, that resistance is of the same variety that the City would face in attempting to avoid salary and benefit increases that it could afford in CBAs with prospective contract terms; at the very least, this resistance is not so materially different in the context of negotiating retroactive CBAs as to constitute an "unreasonable or absurd result" that would cause this Court to ignore the plain meaning of the statute's language.[157]  Therefore, I find that the Arbitrator and the

---

[155] The same principle applies if the parties' negotiations over a successor agreement stretch past FY 2015.

[156] *See supra* Part III.A.4.

[157] This specific collective bargaining dispute illustrates my point.  Here, whereas the FOP's LBFO included a modest cost-of-living adjustment in prior years, the City's LBFO included no cost-of-living adjustment and called for an increase in employee contributions to healthcare costs in then-future years, effecting a prospective *reduction* in the City's costs in those years.  The

PERB did not err as a matter of law in excluding FY 2015 costs from its calculation of the total projected costs of the FOP's LBFO.

> *D. Applying the Proper Standard, the FOP's LBFO Is Not Disqualified Under Section 1615(d)(6)*

Having determined the applicable standard under Section 1615(d)(6), as well as the appropriate estimation of the costs of the FOP's LBFO, I turn to considering whether the City had the financial ability to meet the costs of the FOP's LBFO. The record on appeal is sufficient to find that, though the Arbitrator and the PERB applied the wrong standard in the decisions below, their ultimate determination that the City could meet the costs of the FOP's proposal was correct. The parties stipulated that, as to the City's General Fund, the City had a net operating surplus of $6,055,527 in FY 2011; a net operating surplus of $7,444,088 in FY 2012; a net operating surplus of $1,326,984 in FY 2013; and a net operating deficit of $1,170,833 in FY 2014. Netting these throughout the four-year duration of the FOP's proposal—as I must under the rationale of *Fraternal Order of Police, Lodge 5*—the City had a net operating surplus in the General Fund of $13,655,766 from FY 2011 to FY 2014, more than sufficient to cover the proposal's estimated costs of $127,648.

---

City's own position in this collective bargaining dispute, then, illustrates that costs are not necessarily "locked in" in from contract to contract.

## IV. CONCLUSION

For the foregoing reasons, the decision of the PERB is reversed in part and affirmed in part. Although I have found that the Arbitrator's and the PERB's legal errors were ultimately insignificant in their consideration of whether the FOP's LBFO should be disqualified under Section 1615(d)(6), I am hesitant to enter a final judgment in this matter based on that conclusion. A POFERA arbitrator, after determining that the parties' LBFOs are not disqualified under subsection (d)(6), is given discretion to choose between the proposals based on a balancing of the other Section 1615(d) factors. Though the Arbitrator here has already exercised that discretion and selected the FOP's proposal, it is unclear to me to what extent the legal rulings in this Memorandum Opinion may affect the balancing of the other Section 1615(d) factors, and thus to what extent an entry of final judgment in this Court at this point in the proceedings would tread on the Arbitrator's statutory discretion. Therefore, the parties should confer and inform the Court whether a remand to the Arbitrator is appropriate in light of this Memorandum Opinion.

IT IS SO ORDERED.