**Frances V. ANGSTADT, Plaintiff–Below, Appellant,**

v.

**RED CLAY CONSOLIDATED SCHOOL DISTRICT, Defendant–Below, Appellee.**

No. 548, 2009.

Supreme Court of Delaware.

Submitted: April 13, 2010.

Decided: July 8, 2010.

Reargument and Rehearing En Banc Denied July 30, 2010.

Timothy J. Wilson, Esquire, (argued) of The Wilson Firm, LLC of Newark, Delaware, for appellant.

Barry M. Willoughby, Esquire, (argued) and Michael P. Stafford, Esquire, of Young, Conaway, Stargatt & Taylor, LLP of Wilmington, Delaware, for appellee.

Before STEELE, Chief Justice, HOLLAND, and RIDGELY, Justices.

RIDGELY, Justice:

Dr. Frances Angstadt appeals from the Superior Court's decision granting summary judgment in favor of Red Clay Consolidated School District on her complaint alleging wrongful termination of employment as a teacher. Dr. Angstadt contends that the School District did not substantially comply with the procedural requirements of 14 *Del. C.* § 1410(b) in its decision not to renew her employment contract. She argues the School District improperly considered four correspondences that were not properly placed in her personnel file prior to her notice of termination and that the Superior Court erred in construing the term "other documented materials" to include these four correspondences. She also argues that the School District improperly considered unfavorable information within a Lesson Plan Analysis without placing her on an individual improvement plan.

Because the four correspondences relied upon by the School District were not "properly placed" in Dr. Angstadt's personnel file as required by § 1410(b), they were improperly considered. The unfavorable information within the Lesson Plan Analysis was properly considered because it constituted "other documented material" within Dr. Angstadt's personnel file. Although flawed, the School District's decision not to rehire substantially complied with the procedural requirements of § 1410(b). Accordingly, we affirm.

### Facts and Procedural History

Cab Calloway School of the Arts, a member of the School District, hired Dr. Angstadt as a drama and stage technical teacher for the 2006–2007 school year. During the course of the year, Dr. Angstadt received four correspondences addressing concerns about her interactions with students and her teaching abilities. None of them were placed in her personnel file. These correspondences, along with a lesson plan analysis, served as the reasons for the School District's decision not to

renew Dr. Angstadt's employment contract.

### Email concerning Dr. Angstadt's verbal reprimand of a student

The first correspondence was an e-mail. On November 3, 2006, Dean Julie Rumschlag overheard Dr. Angstadt verbally reprimanding a student. Later that day, Dean Rumschlag emailed Dr. Angstadt concerning the incident:

> I was shocked to see the way you spoke to [Student] earlier today when I passed by your classroom and he was standing in the hallway. What I saw was you yelling at him well beyond what is necessary as a teacher, particularly in this circumstance ... I heard you yell at him, screaming that you had told him to stand out in the hall stand here! You were the one that was not in control of the situation. You are the one who needs to be professional and remain calm in situations such as this one when students do not comply with your requests.

In a responding email, Dr. Angstadt admitted that her interaction with the student was "severe" and would "not happen again." It is undisputed that this email was never placed in Dr. Angstadt's personnel file.

### Meeting and follow-up email regarding a parent's concerns

The second correspondence was also an e-mail. On November 29, 2006, Dean Rumschlag met with Dr. Angstadt to discuss concerns about Dr. Angstadt reported to the school by a parent. After the meeting, Dean Rumschlag emailed Dr. Angstadt:

> Thanks for meeting this afternoon about the concerns brought up by the parent. After you left, I did go back over the notes again and wanted to clarify a few items.

We already talked about two concerns addressed:

1. Seat time vs. Acting time and finding that balance between them.

2. Interactive with kids appropriately, i.e., not losing control as an adult or yelling at them.

3. Making sure expectations are clear, i.e., why certain scenes are inappropriate, and making sure they know those guidelines in advance.

The other things that I noticed in the notes were:

1. A concern of a great deal of work being mostly verbal, boring, tedious, i.e., students taking notes on what you are talking about without getting visual cues. One reference was a "lecture" on thespians and someone asking what you meant—the inference was that they got the impression they should know that already, and you got mad for asking. (Maybe this refers back to mixing it up a bit, and always making sure you consider students' perceptions of what they are assigned to do.

2. The other concern was that students are not clear about timelines, deadlines, etc. She mentioned that due dates were not clear, nor were times that they were going to need to be prepared to be on stage clear. (This may refer back to # 3 above—making sure students know the expectations across the board.)

These may not really be concerns, but they were the impression of this particular child/parent, so it's good for you to be aware of this feedback.

Dr. Angstadt responded to Dean Rumschlag's email saying "[t]hanks for your time. The feedback is always helpful in reassessing how I am received by parents and students. It helps me restructure where necessary." It is undisputed that this email was never placed in Dr. Angstadt's personnel file.

### The "ice cream incident" and subsequent letter

The third correspondence was a letter. On March 14, 2007, Dr. Angstadt received a letter from Assistant Principal Dr. Joe Hocking regarding an incident involving three female students that took place on February 28, 2007. The letter stated:

> You mentioned in our conversation that you grabbed the ice cream out of the student's hands to throw it away. In the future, I would recommend not grabbing anything from a student unless they are in danger of hurting themselves or someone else. Better to ask them to throw the item away and if they refuse, send them to Time–Out and write them up for defiance.

> You also mentioned that the incident had made you angry because the students "do it all the time." The teachers who you identified as witnessing the event confirmed that you seemed very angry. Please remember not to take these incidents personally. It is important that you always remain professional and avoid raising your voice at the students or allowing your anger to dictate your response to them.

Dr. Angstadt signed an acknowledgement of receiving Dr. Hocking's letter. It is undisputed that the letter was never placed in Dr. Angstadt's personnel file.

### Letter concerning incident with student on March 21, 2007

The fourth correspondence was also a letter. Dr. Angstadt received a letter from Dean Rumschlag concerning an incident that occurred on March 21, 2007, when Dean Rumschlag overheard Dr. Angstadt verbally reprimanding students in her classroom. The letter stated:

> This morning I happened to be walking by your classroom when I heard you yelling at maximum volume at several students in your class. You were yelling, "Knock it off! I said knock it off!" I stepped into the room when I heard this interaction.

> \* \* \*

> It is important that I reiterate to you that it is not appropriate to yell at students. It puts you in a situation where you are not in control. It can be frightening and intimidating to students.

> \* \* \*

> When you lose control, it is you who loses credibility with your students. It is you who demonstrates a lack of professionalism. The only time it would be appropriate to raise your voice as I heard today would be in a situation where there is imminent danger of a child that needs immediate and quick attention to ensure the safety of the child. That was clearly not the case at all today when I arrived to your classroom.

> It is my expectation that such an incident does not happen again.

Dr. Angstadt signed an acknowledgement of receiving Dr. Hocking's letter on March 30, 2007. It is undisputed that the letter was never placed in Dr. Angstadt's personnel file.

Under the collective bargaining agreement between the teachers and the School District, teachers could file a grievance of any reprimand, essentially challenging its validity. Dr. Angstadt filed a grievance of this letter, and Dean Rumschlag upheld its

issuance. Dr. Angstadt then filed a "Level II" grievance of the letter at the School District level. Upon receipt at the School District office, a hearing was scheduled. Before the hearing was held, however, the School District decided not to proceed with the hearing.

### Dr. Hocking's unannounced Lesson Plan Analysis for March 29, 2007

On March 29, 2007, Dr. Hocking observed Dr. Angstadt's class in an unannounced visit. Dr. Hocking then composed a Lesson Plan Analysis detailing the concerns revealed in the observation. After composing the Lesson Plan Analysis, Dr. Hocking held a meeting with Dr. Angstadt to review the concerns. In the Lesson Plan Analysis, Dr. Hocking noted that

[m]uch of the interaction taking place involved Ms. Angstadt asking the class to be quiet. While Ms. Angstadt tried various ways to get the student's attention they were often ineffective and required multiple requests on Ms. Angstadt's part. Eventually the class came to order but much time was spent getting students to pay attention.

It is undisputed that the Lesson Plan Analysis was placed in Dr. Angstadt's personnel file.

### School District's decision not to rehire

On April 19, 2007, the School District sent Dr. Angstadt a letter notifying her of the Board's decision not to rehire her at the conclusion of the 2006–2007 school year. In response to this letter, Dr. Angstadt requested the reasons for the Board's decision. The Deputy Superintendent responded with a letter dated May 15, 2007, that identified three reasons for termination: (1) inappropriate teacher/student interactions; (2) inconsistent and inappropriate student discipline; and (3) poor classroom management and organization.

On June 7, 2007, Dean Rumschlag completed Dr. Angstadt's annual Performance Appraisal. The Performance Appraisal indicated that Dr. Angstadt received a "Needs Improvement" in the areas of "Organization and Management of the Classroom" and "Teacher/Student Interaction."

After receiving the reasons for termination, Dr. Angstadt requested a post-termination meeting with the Superintendent. The Superintendent met with her and upheld the termination stating:

After your hearing on June 7, 2007, the documents which you submitted, as well as, information from the school were reviewed. Although Principal and Assistant Principal confirmed that many of your classes were well done, the concern with teacher-student interactions and classroom management were ongoing. Screaming at students and losing control of the class is very ineffective and, as a 15–year teaching veteran is a serious concern. Additionally, you indicated that March 29, 2007, was your first indication that there was any problem. As early as November 3, 2006, the Principal indicates you were made aware of concerns about student-teacher interaction. In addition, mediation sessions began in October in order to try to help resolve issues between teacher and students. Based on this information, your request to rescind your non-renewal is being denied.

Dr. Angstadt then filed a complaint in the Superior Court against the School District alleging wrongful termination. The School District filed a motion for summary judgment, which the Superior Court granted. The Superior Court held that the School District "substantially complied" with the requirements of § 1410(b), stating that "[u]nder these circumstances

the [c]ourt is unwilling to expose a school district to liability for back pay and benefits simply because an administrator or an assistant failed to put copies of these documents in the correct red well." The Superior Court did not address the School District's alternative argument that the unfavorable information in the Lesson Plan Analysis was "other documented material" upon which the School District could rely. This appeal followed.

### Discussion

■■■ On appeal of an administrative agency's adjudication, this Court's sole function is to determine whether the Board's decision is supported by substantial evidence and is free from legal error.[1] We review questions of statutory interpretation *de novo* because they are questions of law.[2]

### Delaware's Teacher Termination Statute

At issue in this appeal is whether the School District complied with the procedural requirements of 14 *Del. C.* § 1410(b)[3] which provides, in relevant part: "the stated reason or reasons must have either been contained in the teacher's performance appraisal, and the teacher was provided time to correct any deficien-

cy through an individualized improvement plan or other documented materials properly placed in the teacher's personnel file prior to said notice."

The General Assembly has qualified the reasons for a decision not to rehire in two ways. The School District can base its decision on reasons contained within the teacher's performance appraisal provided the teacher has had an opportunity to correct any deficiency through an individualized improvement plan. In the alternative, the stated reason or reasons must have been contained in other documented materials properly placed in the teacher's personnel file prior to the notice.

### The emails and correspondences were not "properly placed" in Dr. Angstadt's personnel file

■■■ It is undisputed that the four correspondences were never placed in Dr. Angstadt's personnel file. Under § 1410, the School District may rely upon "other documents" contained in the personnel file at the time notice is given. Because these correspondences were not in the file, the School District's reliance on them in its decision not to rehire failed to comply with the plain language of § 1410.

**1.** *Oceanport Ind. v. Wilmington Stevedores, Inc.*, 636 A.2d 892 (Del.1994).

**2.** *Delaware Bay Surgical Serv. v. Swier*, 900 A.2d 646, 652 (Del.2006).

**3.** 14 *Del. C.* § 1410(b) provides: "A teacher who has not completed 3 years of service in the State and/or has not completed 2 years in the employ of the terminating board may, within 7 days of receiving notice of intention to terminate services, request in writing, the reason or reasons for such notice. The board will provide such reason or reasons in writing and a copy of this chapter no later than 5 days after receipt of such a request, provided that the stated reason or reasons must have either been contained in the teacher's performance appraisal, and the teacher was provided time to correct any deficiency through

an individualized improvement plan or other documented materials properly placed in the teacher's personnel file prior to said notice. In providing the reason or reasons, the board is not limited to the reasons set forth in § 1411 of this title. Within 7 days of receiving the reason or reasons for the notice of intention to terminate services, a teacher may request in writing a conference with the board's superintendent for the purpose of discussing the reason or reasons and attempting to resolve any disputed matter. Within 10 days of receiving such a request for a conference, the superintendent shall personally provide the teacher a conference to review the matter. The conference with the superintendent is final and conclusive."

In *Board of Public Education in Wilmington v. Delancey*, we held that a school district had substantially complied with § 1410's predecessor when a superintendent (rather than the Board as the statute required) gave notice to a teacher of the school's intent to terminate services. The teacher requested, and the Board held, a public hearing in which the teacher was represented by counsel. After the Board affirmed its earlier judgment, the teacher appealed to the Superior Court. The Superior Court found merit to his argument that the notice to terminate services was ineffective because the statute required notice be given by the Board. On appeal to this Court, we reversed and held that the Board substantially complied with the statute:

> We are mindful of the fact that teacher-tenure acts are intended to furnish protection to the public school teacher and that their provisions in respect of dismissal must be substantially complied with. But substantial compliance is enough. What is the underlying purpose of our statute? Plainly to accord to the teacher the right to a notice if his services are intended to be terminated, and the right to a hearing if he is unwilling to accept the intention to terminate as final. Of neither of these rights has the defendant been deprived. The policy and purpose of the statute have been complied with. In justice to the efficient

administration of the school system we cannot agree to the setting aside of the proceedings in this case because of a belated technical objection which in no way prejudiced the teacher.[4]

■ Although "substantial compliance" with § 1410 is sufficient in certain circumstances, the School District failed to meet that threshold with regard to the e-mails and letters never placed in the teacher's personnel file. The School District contends that requiring physical placement of these correspondences in Dr. Angstadt's personnel file is an overly-technical reading of the statute. We cannot ignore the intent of the General Assembly as expressed in the plain language of § 1410.[5] The statute unambiguously requires the documented materials be "properly placed" in the teacher's personnel file in order to be considered. Here, they were not.

The School District argues that we should adopt a functional definition of the term "personnel file." It contends that the Delaware Right to Inspect Personnel Files Act[6] supports this approach, as it defines personnel file by identifying the types of documentation that are included rather than by the physical location of the file. The Act does identify types of documentation that can be included, "if maintained by the employer."[7] This Act pro-

---

**4.** *Board of Public Education in Wilmington v. Delaney*, 155 A.2d 51, 54–55 (Del.1959).

**5.** Where the "language of a statute is plain and unambiguous on its face courts may not alter the plain meaning by construction." *Monacelli v. Grimes*, 99 A.2d 255, 268 (Del. 1953).

**6.** 19 *Del. C.* § 730, *et seq.*

**7.** 19 Del. C. § 731 provides that " 'Personnel file' means, *if maintained by the employer*, any application for employment, wage or salary information, notices of commendations,

warning or discipline, authorization for a deduction or withholding of pay, fringe benefit information, leave records, employment history with the employer, including salary information, job title, dates of changes, retirement record, attendance records, performance evaluations and medical reports. The term 'personnel file' shall not include records of an employee relating to the investigation of a possible criminal offense, letters of reference, documents which are being developed or prepared for use in civil, criminal or grievance procedures or materials which are used by the employer to plan for future operations or

vides employees the right to access the files that employers have maintained and rely upon in making decisions impacting the individual's employment. But the Act does not address how an employer must maintain the files in order to rely upon them in making a decision not to renew an individual's employment contract. As to teachers, section 1410 does. Accordingly, 19 Del. C. § 731 does not modify the plain meaning of "properly place in the personnel file" as it is used in § 1410.

The proper placement of documents in a teacher's personnel file was intended by the General Assembly to furnish protection to the public school teacher by providing both a file record in either paper or electronic format, that can be reviewed along with notice of the potential grounds for not renewing a teacher's employment contract. If the School District intends to rely upon "other documented materials," they must be in a teacher's personnel file before the notice of an intention to terminate services is given. Because the correspondences were not "properly placed" in the personnel file of Dr. Angstadt before the notice, the School District's reliance upon them was contrary to § 1410.

### Dr. Hocking's Lesson Plan Analysis

■ Alternatively, the School District contends that Dr. Hocking's Lesson Plan Analysis was "properly placed" in Dr. Angstadt's personnel file and justified its decision not to rehire. Dr. Angstadt contends that she was wrongfully terminated because she was not placed on an IIP and given an opportunity to improve. Section 1410(b) provides that the School District may rely on a "teacher performance appraisal" after the teacher is placed on an IIP and provided an opportunity to improve with an IIP. The School District does not argue that it relied on Dr. Hocking's Lesson Plan Analysis as a Performance Appraisal.

Rather, the School District contends that it may rely on Dr. Hocking's Lesson Plan Analysis because it constitutes "other documented material" that was properly placed in Dr. Angstadt's personnel file. It is undisputed that Dr. Hocking's Lesson Plan Analysis was "properly placed" in Dr. Angstadt's personnel file prior to the notice of intention to terminate. Dean Rumschlag's annual Performance Appraisal was also placed in the personnel file. As acknowledged by Dr. Angstadt, the Lesson Plan Analysis is a preliminary document and not the year-end summative Performance Appraisal. If the Lesson Plan Analysis constitutes "other documented materials," § 1410(b) permits the School District's reliance upon it in its decision not to renew Dr. Angstadt's employment contract.

### "Other documented materials"

"[O]ther documented materials" is not defined in section 1410, although the context suggests they are documents other than the "teacher's performance appraisal." Dr. Angstadt argues the General Assembly intended the definition of "other documented materials" to be to be limited to reprimands. In support of her argument, she refers to McCoy v. Sussex County Vocational–Technical School District.[8] There, the Court of Chancery held that an invalidly issued reprimand cannot be considered to be "properly placed" in the teacher's personnel file. In its decision, the Court of Chancery stated that "other documented materials" "refers to what are commonly known to teachers as

---

information available to the employee under the Fiar Credit Reporting Act." (emphasis added).

8.  1998 WL 671280 (Del.Ch. Aug. 27, 1998).

reprimands." [9] But *McCoy* did not turn on the classification of a document as "other documented materials." We review issues of statutory interpretation *de novo*.[10]

In interpreting undefined statutory terms, we must give them a "reasonable and sensible meaning in light of their intent and purpose." [11] Because dictionaries are routine reference sources that reasonable persons use to determine the ordinary meaning of words,[12] we often rely on them for assistance in determining the plain meaning of undefined terms.[13] "Documented" means "to support (e.g., statements in a book) with written references or citations." [14] Materials are defined as "tools or apparatus for performing a given task." [15] Accordingly, "other documented materials" means other written references—apart from "the teacher's performance appraisal"—that are supportive tools for performing the task of deciding whether or not to renew Dr. Angstadt's employment contract.

"Other documented materials" is broad language. Although a written reprimand is "other documented material," the phrase is not limited to written reprimands. This interpretation complies with the intent and purpose of § 1410(b). The statute provides procedural requirements for a School District's decision not to renew a teacher's employment contract. It does not address substantive grounds for termination, but addresses the procedure for termination. Narrowly construing "other documented materials" to encompass only formal reprimands places greater restrictions on the permissible reasons for a School District's decision than the General Assembly intended.

Although Dean Rumschlag performed Dr. Angstadt's annual Performance Appraisal, the School District did not rely upon that document. Nor could they have, as the decision to terminate was made before the document existed. Instead, the School District relied upon the observations of Dr. Hocking as reported in the Lesson Plan Analysis. Dr. Hocking's Lesson Plan Analysis is a written reference that was a supportive tool for any lawful task. It was not privileged as a matter of law,[16] and could be used in the process of deciding whether to renew Dr. Angstadt's employment contract. Dr. Hocking's Lesson Plan Analysis which concluded that Dr. Angstadt was "ineffective" in getting her students' attention, constitutes "other documented material" that was "properly placed" in Dr. Angstadt's personnel file and the School District could rely upon it in deciding whether to renew Dr. Angstadt's employment contract. Although

9. *Id.*, at *5.

10. *Dambro v. Meyer*, 974 A.2d 121, 129 (Del. 2009); *Delaware Bay Surgical Serv. v. Swier*, 900 A.2d at 652.

11. *E.I. Du Pont De Nemours & Co. v. Clark*, 88 A.2d 436, 438 (Del.1952).

12. *Lorillard Tobacco Co. v. Am. Legacy*, 903 A.2d 728 (Del.2006).

13. *See, e.g., Lorillard Tobacco Co.*, 903 A.2d 728; *Northwestern Nat'l Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 44 (Del.1996); *Hibbert v. Hollywood Park, Inc.*, 457 A.2d 339, 343 n. 3 (Del.1983).

14. WEBSTER'S II NEW COLLEGE DICTIONARY (2001).

15. *Id.*

16. *Compare* 24 *Del. C.* § 1768(b). *See also Office of the Chief Medical Examiner v. Dover Behavioral Health System*, 976 A.2d 160 (Del. 2009) (protecting documents that are used exclusively by peer review committees from discovery by the Office of the Chief Medical Examiner because of the statutorily created peer review privilege).

different from the rationale used by the Superior Court, we affirm on this basis.[17]

### Conclusion

The judgment of the Superior Court is **AFFIRMED.**

---

**17.** *See Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1390 (Del.1995) ("We recognize that this Court may affirm on the basis of a different rationale than that which was articulated by the trial court.").