**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

**SELENA E. MOLINA**
**MASTER IN CHANCERY**

LEONARD L. WILLIAMS JUSTICE CENTER
500 NORTH KING STREET, SUITE 11400
WILMINGTON, DE 19801-3734

Final Report: March 31, 2023
Date Submitted: December 13, 2022

Scott E. Swenson
Connolly Gallagher, LLP
1201 N. Market Street, 20th Floor
Wilmington, DE 19801

Jason C. Powell
Thomas Reichert
The Powell Firm, LLC
1201 N. Orang Street, Suite 500
Wilmington, DE 19899

Re:  *Jane Maughan, as attorney-in-fact for Bridget Wilson v. Estate of Barry Wilson*, C.A. No. 2022-0397-SEM

Dear Counsel:

Through this action, an attorney-in-fact seeks to unwind actions taken by her predecessor. Per the plaintiff, the prior attorney-in-fact (now deceased) either lacked authority to act or, in doing so, breached his fiduciary duties to the principal. The predecessor's estate counterclaimed seeking a declaration that the challenged transactions were appropriate and enforceable, a finding that the plaintiff's claims are barred by the plaintiff's unclean hands, and an accounting from the plaintiff. On cross-motions for partial summary judgment, I am tasked with addressing whether (1) the predecessor lack authority, (2) the predecessor's conduct should be upheld by way of public policy, or (3) the plaintiff has come to this Court with unclean hands.

I find the first answer should be "yes"—the prior attorney-in-fact lacked authority because he failed to sign the statutorily-required certification. I further find that public policy considerations cannot resolve this deficiency, nor has the former agent's estate established that the new agent has unclean hands. Thus, I recommend that the new agent's motion for partial summary judgment be granted, the cross-motion denied, and the questioned transactions unwound.

This is my final report.

## I.     BACKGROUND[1]

At issue are actions taken by the late Barry Wilson (the "Former Agent") on behalf of Bridget Wilson (the "Principal") under a power of attorney. The Former Agent and the Principal were married on April 3, 1993.[2] When they married, the Principal had two children from a prior marriage.[3] Although otherwise sharing their life together, the Principal and the Former Agent did not have any children together.[4] They did, shortly after their marriage, purchase a home together at 210 Hitching Post

---

[1] The parties relied primarily on the pleadings in their factual recitations. *See, e.g.*, Docket Item ("D.I.") 9 p.4, n.1. Exhibits to the motion for partial summary judgment and the reply are cited as Ex. A-E, matching the lettering in D.I. 9. *See also* D.I. 37 (attaching the same documents).

[2] D.I. 4, ¶ 2.

[3] *Id.*

[4] *Id.*

Drive in Wilmington, Delaware (the "Marital Home").[5]  The Marital Home was purchased by the Principal and the Former Agent as husband and wife for $242,500.00.[6]

In 2013, when the Principal was 60 years old, she was diagnosed with early onset dementia.[7]  "[W]hile still competent," on April 24, 2013, the Principal executed a power of attorney appointing the Former Agent as her attorney-in-fact and her sister, Jane Maughan (the "Plaintiff"), the Principal's sister, as successor attorney-in-fact (the "2013 POA").[8]  The 2013 POA, in pertinent part, authorized the Former Agent to: (1) "deposit any monies which may come into the hands of [the Former Agent] with any bank or banker, either in [the Principal's] name or the [Former Agent's] name," (2) "sell, either at public or private sale, or exchange any part or parts of [the Principal's] real estate or personal property for such consideration and upon such terms as the [Former Agent] shall deem fit, and to execute and deliver good and sufficient deeds or other instruments for the conveyance or transfer of the same," (3) "transfer some or all of [the Principal's]

---

[5] *Id.* at ¶ 4.

[6] Ex. A.

[7] D.I. 4, ¶ 1.

[8] *Id.* at ¶ 3.

assets to the Trustee of any inter vivos trust created by [the Principal] subsequent to the execution of [the 2013 POA];" (4) "make any and all decisions and take any and all acts that could be made by [the Principal] regarding" her pension, disability insurance, health insurance, retirement, and other benefits and entitlements; and (5) "have the full power, right and authority to do, perform and to cause to be done and performed, all such acts, deeds, matters and things in connection with [the Principal's] property and estate as the [Former Agent], in the [Former Agent's] sole discretion, shall deem reasonable, necessary and proper, as fully, effectually and absolutely as if the [Former Agent] were the absolute owner and possessor thereof[.]"[9]

After the Principal executed the 2013 POA, however, the Former Agent did not execute a certification or any other documentation formally accepting the appointment. But he did invoke the 2013 POA to make several Medicaid-planning transactions on the Principal's behalf as she declined.[10]

---

[9] Ex. B.

[10] The timeline of the Principal's decline appears to be in dispute, but this dispute is not material to the questions before me. *See* D.I. 20, ¶ 5. There is also no dispute that the Principal, who is now 68 years old, "is currently in the end stages of her disease." *Id.* at ¶ 1.

On March 11, 2019, the Former Agent executed a Miller Trust (the "Trust") on the Principal's behalf, with the stated purpose of making her eligible for Medicaid.[11]  The Trust names the Former Agent as trustee with the Plaintiff as successor.[12]  The Principal is the beneficiary of the Trust, which provides, in pertinent part, for (1) income payments to the Principal and her community spouse during her lifetime and (2) Medicaid recovery upon the Principal's death.[13]

On the same day the Trust was established, the Former Agent executed a deed transferring the Principal's interest in the Marital Home to himself for $10.00 (the "2019 Deed").[14]  The 2019 Deed was purportedly executed for Medicaid planning purposes.[15]  The Former Agent signed the 2019 Deed as the Principal's agent-in-fact and attached the 2013 POA in support.[16]

"At some point in 2019," the Former Agent also opened a brokerage account with MML Investors Services, LLC (the "MML Account").[17]  The MML Account

---

[11] Ex. C.

[12] *Id.*

[13] *Id.* The Defendant avers that the Trust was never funded. D.I. 20, ¶ 9, 10.

[14] Ex. D.

[15] D.I. 4, ¶ 6.

[16] *Id.* at ¶ 11.

[17] *Id.* at ¶ 12.

was opened with cash and "at least $251,000.00 of the funding came from a joint account" owned by both the Principal and the Former Agent.[18] The Former Agent's estate (the "Defendant") avers the Former Agent "had any and all rights and access to the MML Account" and did not act improperly.[19]

In addition to this Medicaid planning for the Principal, the Former Agent engaged in his own estate planning in 2019. On July 17, 2019, the Former Agent executed his last will and testament (the "Will").[20] Under the Will, the residue of the Former Agent's estate was to pass into a special needs trust for the Principal's benefit.[21] Named as trustee of the special needs trust is the Former Agent's nephew, or grand-nephew, Jeffrey Wilson.[22]

Unfortunately, the Former Agent died suddenly on January 13, 2022.[23] Mr. Wilson was appointed as the executor of the Former Agent's estate.[24] In that

---

[18] *Id.*

[19] D.I. 20, ¶ 12.

[20] Ex. E.

[21] *Id.*

[22] D.I. 20, ¶ 13.

[23] D.I. 4, ¶ 2.

[24] D.I. 20, ¶ 13.

capacity, Mr. Wilson listed the Marital Home for sale and "it was sold for $525,000.00 on April 22, 2022."[25]

With the Former Agent's death, the Plaintiff now serves as the Principal's attorney-in-fact.[26] In her capacity under the 2013 POA, the Plaintiff moved the Principal into the Memory Care Unit at Arden Courts of Wilmington ("Arden Courts").[27] The parties agree that Arden Courts does not accept Medicaid, which the Plaintiff uses to argue that the Former Agent's spenddown has harmed the Principal. Conversely, the Defendant avers the Plaintiff's placement of the Principal in Arden Courts was a unilateral and inappropriate move undertaken "to fabricate a controversy under which [the Plaintiff] can assume control of assets."[28]

The Plaintiff then filed this action on May 6, 2022.[29] In her initial complaint she pled six (6) counts: (1) breach of fiduciary duty regarding the transfer of the Marital Home; (2) breach of fiduciary duty regarding the MML Account; (3) lack of authority under the 2013 POA to create the Trust; (4) breach of fiduciary duty by

---

[25] *Id.* at ¶ 16.

[26] Ex. B.

[27] D.I. 4, ¶ 1. Before that move and while the Former Agent was alive, the Principal and the Former Agent continued to live together in the Marital Home. D.I. 20, ¶ 1.

[28] D.I. 20, ¶ 1.

[29] D.I. 1.

creating the Trust; (5) declaratory judgment for lack of authority to execute the 2019 Deed; and (6) declaratory judgment for lack of authority to create the Trust.

Months later, on September 2, 2022, the Plaintiff filed an amended complaint.[30] The amended complaint contains seven (7) counts: (1) lack of authority under the 2013 POA to transfer the Marital Home; (2) breach of fiduciary duty by transferring the Marital Home; (3) breach of fiduciary duty by creating the MML Account; (4) lack of authority under the 2013 POA to create the Trust; (5) breach of fiduciary duty by creating the Trust; (6) declaratory judgment of lack of authority to execute the 2019 Deed; and (7) declaratory judgment of lack of authority to create the Trust.[31]

Contemporaneously with the amended complaint, the Plaintiff filed her motion for partial summary judgment (the "Motion").[32] Through the Motion, the Plaintiff seeks judgment on the lack of authority counts—Counts I, IV, VI, and VII—which argue that either the 2013 POA did not authorize the Former Agent to transfer the Marital Home or create the Trust or the Former Agent had no authority

---

[30] D.I. 4.

[31] *Id.*

[32] D.I. 5. The Plaintiff also filed a motion for preliminary injunction on October 24, 2022. D.I. 14. Although teed up for consideration with the Motion, the parties were able to resolve the immediate dispute through a proposed stipulated interim settlement order. D.I. 41. I granted the proposed order on December 13, 2022. D.I. 46.

to act under the 2013 POA because he failed to sign a certification accepting his appointment.

On October 27, 2022, the Defendant filed an answer to the amended complaint with affirmative defenses and a counterclaim.[33] The Defendant's second affirmative defense is unclean hands and its counterclaims are (1) declaratory judgment that the Trust was validly created, (2) declaratory judgment that the Marital Home was properly transferred, (3) declaratory judgment that the Former Agent did not breach his fiduciary duties, (4) breach of fiduciary duty by the Plaintiff, (5) unclean hands by the Plaintiff, and (6) a demand for an accounting from the Plaintiff.[34]

On the same day it answered the amended complaint, the Defendant filed an answering brief in opposition to the Motion and a cross-motion for summary judgment (the "Cross-Motion").[35] Through the Cross-Motion, the Defendant seeks judgment in its favor on Count I and IV of the amended complaint. The Plaintiff filed an answer to the counterclaim on November 18, 2022 and the parties completed briefing on the Motion and Cross-Motion by December 9, 2022.[36] On December 13,

---

[33] D.I. 20.

[34] *Id.*

[35] D.I. 21.

[36] D.I. 40, 37, 43.

2022, I heard argument on the Motion and the Cross-Motion and, thereafter, took both under advisement.[37]

## II. ANALYSIS

Under Court of Chancery Rule 56, summary judgment will be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."[38] When reviewing such a motion, I "must view the evidence in the light most favorable to the non-moving party."[39] When, like here, parties file cross-motions for summary judgment and have not argued that a material issue of fact exists, I "deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions."[40]

Here, I recommend that the Motion be granted, and the Cross-Motion denied. I find the Former Agent lacked authority to take the challenged transactions and that deficiency cannot be resolved through public policy considerations nor is the challenge barred by unclean hands. With this holding, I recommend the transactions be unwound as provided herein.

---

[37] D.I. 47.

[38] Ct. Ch. R. 56(c).

[39] *Merrill v. Crothall-American, Inc.*, 606 A.2d 96, 99 (Del. 1992).

[40] Ct. Ch. R. 56(h). As noted below, the facts underlying the unclean-hands argument do appear in dispute, but I find such dispute immaterial to the question before me. Otherwise, the parties have not identified any disputes of fact.

**A.    The Former Agent did not have authority to act without executing a personal power of attorney certificate.**

The Plaintiff argues that she is entitled to judgment as a matter of law because the Former Agent either lacked (1) the specific authority necessary to sell the Marital Home or establish the Trust or (2) any authority to act under the 2013 POA because the Former Agent failed to sign the statutorily required certification. Because I agree with the latter, I do not address the former.

The latter inquiry implicates two provisions of the Delaware Durable Personal Power of Attorney Act (the "DPPAA"). The first permits attorneys-in-fact to accept appointment in a few different ways but the second clarifies that, regardless of how the appointment is accepted, an attorney-in-fact is not authorized to act unless and until the agent signs a certification. The Plaintiff argues that the DPPAA should be strictly construed: because the Former Agent did not sign a certification, the Former Agent lacked authority under the 2013 POA. The Defendant argues that the DPPAA is ambiguous or, if a certification is required, the Former Agent substantially complied with such requirement.

I first address what the DPPAA requires, then I turn to how it applies to the Former Agent. I address the Defendant's larger public policy arguments and unclean hands counterclaim separately.

### 1.     The DPPAA is unambiguous and requires a certification.

Under Delaware law, "[t]he goal of statutory construction is to determine and give effect to legislative intent."[41]  In doing so, I must look first for any ambiguity:

> Where a statute is unambiguous, "there is no room for judicial construction and no need to review the legislative history," and "the plain meaning of the statute controls." "Only where a statute is ambiguous and its meaning cannot be clearly ascertained does a court engage in the process of statutory construction and interpretation," as by looking at other statutory sections.[42]

"The fact that the parties disagree about the meaning of the statute does not create ambiguity. Rather, a statute is ambiguous only if it is reasonably susceptible of different interpretations."[43]  Such is not the case here.

The two sections at issue are 12 *Del. C.* § 49A-113 (the "Acceptance Section") and 12 *Del. C.* § 49A-105(c) (the "Authority Section").  The Acceptance Section provides:

> Except as otherwise provided in the personal power of attorney, a person accepts appointment as an agent under a personal power of attorney by signing the agent's certification (pursuant to § 49A-

---

[41] *Eliason v. Englehart*, 733 A.2d 944, 946 (Del. 1999).

[42] *Chen v. Taipei Am. Sch. Found.*, 2023 WL 447692, at *6 (Del. Ch. Jan. 27, 2023) (citations omitted).

[43] *Chase Alexa, LLC v. Kent Cnty. Levy Ct.*, 991 A.2d 1148, 1151 (Del. 2010) (citations omitted).

105(c) of this title) or by exercising authority or performing duties as an agent or by any other assertion or conduct indicating acceptance.[44]

The Authority Section provides:

Regardless of the method by which a person accepts appointment as an agent under a personal power of attorney (pursuant to § 49A-113 of this title), such agent shall have no authority to act as agent under the personal power of attorney unless the agent has first executed and affixed to the personal power of attorney a certification[.][45]

The DPPAA further provides a form of certification for agents, through which the agent acknowledges that they will (1) act in accordance with the Principal's expectations, in good faith, and within the scope of authority granted, (2) keep in regular contact with the Principal, (3) keep the Principal's assets separate (unless authorized otherwise in the power), and (4) keep full and accurate records.[46]

Although the parties disagree regarding how these sections of the DPPAA should be interpreted, I find they are not reasonably susceptible to different interpretations. The text of each section is clear—the Acceptance Section sets forth how an agent may accept the appointment and the Authority Section clarifies that regardless of how an agent accepted the appointment, the agent is only authorized to act after executing the required certification.

---

[44] 12 *Del. C.* § 49A-113.

[45] 12 *Del. C.* § 49A-105(c).

[46] *Id.*

The Defendant posits:

> If . . . the agent needs to execute an agent certification first, then why would there be multiple ways to accept the appointment which includes executing a certificate? If every agent must execute a certificate to have authority to act under a POA, how is it possible to accept the appointment in any other manner such as 'by exercising authority'[?][47]

But, as written, these sections work together and expressly contemplate and incorporate each other.

I liken the scheme to the standard hiring process—an offer of employment is made (a principal executes a power of attorney), that offer is accepted (the agent accepts under the Acceptance Section), then the new employee fills out the necessary paperwork for final work authorization (the agent completes the certification under the Authority Section). Just as an agent can accept their position by filling out the certification, one can envision a situation where a new hire accepts their position by filling out the new hire paperwork. But this potential overlap does not render step two meaningless. The Acceptance Section and Authority Section are delineated separately and purport to serve different functions. Because the plain language of these sections of the DPPAA is clear and unambiguous, my review stops here.[48]

---

[47] D.I. 21, p.25.

[48] Reading the DPPAA any other way would violate the canons of statutory construction that all harmonious sections should be given affect and to avoid construing language as surplusage. *See Chase Alexa, LLC*, 991 A.2d at 1152.

### 2.    The Former Agent lacked authority to take the challenged actions.

There is no dispute that the Former Agent failed to sign the certification required under the Authority Section.  But the Defendant argues that the Former Agent substantially complied with the Authority Section by (1) taking steps to ensure other requirements of the DPPAA were met and (2) exercising authority under the 2013 POA.

Substantial compliance can be found when "[t]he policy and purpose of the statute have been complied with."[49]  If so, under certain circumstances, "substantial compliance is enough."[50]  But substantial compliance cannot be invoked to "ignore the intent of the General Assembly as expressed in the plain language of" a statute.[51]

This limitation is evident in the Delaware Supreme Court's decisions in *Board of Public Education in Wilmington v. Delaney*[52] and *Angstadt v. Red Clay*

---

[49] *Bd. of Pub. Ed. in Wilm. v. Delaney*, 155 A.2d 51, 55 (Del. 1959).

[50] *Id.* at 54.

[51] *Angstadt v. Red Clay Consol. Sch. Dist.*, 4 A.3d 382, 388 (Del. 2010).  I assume, without deciding, that a substantial-compliance argument is viable in the power-of-attorney context. It may not be. *Cf. Carl M. Freeman Assocs., Inc. v. Green*, 447 A.2d 1179, 1181-82 (Del. 1982) (holding that "substantial compliance" was insufficient, because "zoning ordinances are in derogation of common law property rights, [there must be] strict compliance with the [legislated] procedures").

[52] 155 A.2d 51, 55 (Del. 1959).

*Consolidated School District*,[53] both of which addressed the Delaware Teacher Tenure Act. In *Wilmington*, the Court rejected technical objections to a notice required under the act, noting that the notice substantially complied with the policy and purpose of the act and the technical deficiencies did not prejudice the complaining party.[54] But in *Red Clay*, the Court rejected a substantial-compliance argument that the failure to place emails and letters in a teacher's file was overly technical and, instead, followed the plain language of the act requiring such.[55] Because the school district did not "properly place" emails and letters in the teacher's file, as it was required to under the act, the school district could not rely on those documents, as provided by the act.[56]

The Delaware Supreme Court has also blessed substantial compliance in the estate context. In *Matter of Will of Carter*, the testator failed to sign his will but signed the self-proving affidavit attached to it.[57] Under the circumstances presented, the Court found the signature on the self-proving affidavit substantially complied with the statutory requirement that the underlying will be signed. The

---

[53] 4 A.3d 382, 388 (Del. 2010).

[54] *Wilmington*, 155 A.2d at 55.

[55] *Red Clay*, 4 A.3d at 388.

[56] *Id.* at 389.

[57] 565 A.2d 933, 935 (Del. 1989).

Defendant also points me to a decision from the Middle District of Pennsylvania, *Hartford Life & Accident Insurance Co. v. Hayes*.[58] At issue was whether the policyholder changed her beneficiary before her death, with one side contending the policyholder completed and mailed a change form that was not timely filed with the insurance company through no fault of the policyholder. The court denied summary judgment finding a jury could find substantial compliance with the policy: "the jury could . . . find that, in light of her physical condition, [the policyholder] did everything she could to effectuate the change in her beneficiary by executing a notarized change of beneficiary form in the presence of witnesses and giving it to her power of attorney to mail on her behalf."[59]

This case is far removed from *Hartford*, *Carter*, and *Wilmington*. Unlike *Carter*, the Former Agent did not sign a document appended to or incorporated in the unsigned certification. Nor did he sign a certification that, for technical reasons, failed to strictly comply with the Authority Section but otherwise met the spirit and character of the law. He merely accepted the appointment under one of the methods under the Acceptance Section. Such action is not substantial compliance with the Authority Section; to hold overwise would violate the plain meaning of the DPPAA.

---

[58] 2014 WL 4916200 (M.D. Pa. Sept. 30, 2014).

[59] *Id.* at *5.

The Former Agent failed to execute a personal power of attorney certificate as required under the Authority Section.  As such, he never had authority to act as the Principal's attorney-in-fact.  Drawing from the corporate law context, I find his actions are, thus, voidable at the behest of the Principal or the Plaintiff as her attorney-in-fact.[60]  The Plaintiff has made such request through this action and I find judgment should be entered in favor of the Plaintiff on Counts VI and VII.  Such judgment should set aside the 2019 Deed, declare the Principal to be the owner of the proceeds from the sale of the Marital Home, set aside the Trust, and declare the Principal to be the owner of the Trust's principal.

> **3.** **Because the Former Agent did not have authority to act under the 2013 POA, I need not address whether those actions were or were not expressly authorized under the 2013 POA.**

Through Counts I and VI, the Plaintiff claims the Former Agent lacked authority under the 2013 POA to transfer the Marital Home or establish the Trust.  The parties agree that the DPPAA requires an agent to have express authority to take either of these actions; hotly contested is whether the 2013 POA provides such

---

[60] *See Michelson v. Duncan*, 407 A.2d 211, 218–19 (Del. 1979) ("The essential distinction between voidable and void acts is that the former are those which may be found to have been performed in the interest of the corporation but beyond the authority of management, as distinguished from acts which are Ultra vires, fraudulent or gifts or waste of corporate assets.").

express authority.[61]  Contest aside, through these claims, the Plaintiff seeks the same

relief as that requested under Counts VI and VII, which I recommend the Court grant

for the above reasons.  On this record, I decline to separately address Counts I and

VI, which would inject disfavored dictum into this ruling, and recommend, instead,

that these counts be treated as moot.[62]

### B.    Notions of public policy cannot save the unauthorized transactions.

The Defendant argues that if I find the Former Agent lacked authority to

execute the 2019 Deed and the Trust, I would be undermining the public policy goals

surrounding Medicaid planning.  Specifically, the Defendant argues that the Former

Agent's actions were necessary in his role as attorney-in-fact and that he would have

breached his fiduciary duty by "failing to expeditiously obtain public aid, thereby

dissipating respondent's estate."[63]

These policy considerations are not fanciful.  But, here, on the Motion and

Cross-Motion the question is not whether Medicaid planning is or is not laudable

---

[61] D.I. 40, ¶¶ 63, 70. *See also* 12 *Del. C.* § 49A-201(b)(3).

[62] *See In re MFW S'holders Litig.*, 67 A.3d 496, 521 (Del. Ch. 2013), *aff'd sub nom. Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014) (explaining "[o]ur Supreme Court follows the traditional definition of 'dictum,' describing it as judicial statements on issues that 'would have no effect on the outcome of [the] case'") (citations omitted).

[63] D.I. 21 (quoting *In re Guardianship of Connor*, 170 Ill. App. 3d 759, 763 (5th Cir. 1988)).

and appropriate. The question is whether the Former Agent had authority to act under the 2013 POA—I find he did not. The Former Agent failed to take the statutorily required action of executing a personal power of attorney certificate and, therefore, lacked authority to act under the 2013 POA. This finding in no way jeopardizes the future Medicaid planning efforts of properly authorized agents and fiduciaries.

### C. The Defendant's unclean-hands argument fails.

The Defendant argues that regardless of the merits of the Plaintiff's claims, she comes to the Court with unclean hands and should not succeed. Per the Defendant, the Plaintiff seeks to unwind the Former Agent's transactions for self-serving reasons and to micromanage the Principal's care and finances. The Plaintiff counters that she does not stand to benefit from any funds upon the Principal's death, as the Principal's adult children would receive her property upon her death, under Delaware's intestacy laws. The Plaintiff further argues—and I agree—that the Plaintiff's conduct is not sufficiently tied to the claims at issue to bar the relief requested.

"Unclean hands derives from the equitable maxim that [sh]e who comes into equity must come with clean hands."[64] It is a rule of public policy applied "to protect the public and the court against misuse by one who, because of [her] conduct, has forfeited [her] right to have the court consider [her] claims, regardless of their merit."[65] Although there is no strict formula, the primary question "raised by a plea of unclean hands is whether the plaintiff's conduct is so offensive to the integrity of the court that [her] claims should be denied, regardless of their merit."[66] A secondary question is whether the offensive conduct is connected to the claims at issue. "[F]or the unclean hands doctrine to apply, 'the inequitable conduct must have an immediate and necessary relation to the claims under which relief is sought.'"[67]

Here, question one would require me to weigh contested facts, an exercise not appropriate on summary judgment.[68] But question two is dispositive. Setting aside the veracity of the Defendant's allegations, all of them relate to what the Plaintiff

---

[64] *Murray v. Rolquin*, 2023 WL 2421687, at *13 (Del. Ch. Mar. 9, 2023) (citation and quotation marks omitted).

[65] *Skoglund v. Ormand Indus., Inc.*, 372 A.2d 204, 213 (Del. Ch. 1976).

[66] *Gallagher v. Holcomb & Salter*, 1991 WL 158969, at *4 (Del. Ch. Aug. 16, 1991) *aff'd sub nom. New Castle Ins., Ltd. v. Gallagher*, 692 A.2d 414 (Del. 1997).

[67] *In re Rural/Metro Corp. S'holders Litig.*, 102 A.3d 205, 237–38 (Del. Ch. 2014) (quoting *Nakahara v. NS 1991 Am. Trust*, 718 A.2d 518, 523 (Del. Ch. 1998)).

[68] D.I. 40; *Telxon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del. 2002) (holding that a trial judge is not permitted to weigh evidence on a motion for summary judgment).

did after the Former Agent's death. The Plaintiff's post-death conduct does not have "an immediate or necessary relation" to the claim that the Former Agent lacked authority to act under the 2013 POA. Thus, uncleans hands should not be invoked to bar relief on such claim. For these reasons, I find that the Defendant has not met its burden of showing that unclean hands should be invoked to deny the Motion.

## III.   CONCLUSION

For the above reasons, I find that the Motion should be granted, and the Cross-Motion denied. The Former Agent did not meet the requirements of the Authority Section of the DPPAA and, therefore, had no authority to act as the Principal's agent. The transactions authorized by the Former Agent are, thus, voidable at the Plaintiff's request and should be unwound.

This leaves the Plaintiff's claims for breach of fiduciary duty and the Defendant's counterclaims. The parties shall meet and confer regarding these loose ends and propose a schedule to reach final resolution. Until those matters are resolved, exceptions to this final report under Court of Chancery Rule 144 are stayed.

Respectfully submitted,

/s/ *Selena E. Molina*

Master in Chancery